**AMERICAS MINING CORPORATION,
et al., Defendants Below,
Appellants,**

v.

**Michael THERIAULT, as Trustee for
the Theriault Trust, Plaintiff
Below, Appellee.**

Southern Copper Corporation, formerly
known as Southern Peru Copper Cor-
poration, Nominal Defendant Below,
Appellant,

v.

Michael Theriault, as Trustee for
the Theriault Trust, Plaintiff
Below, Appellee.

Nos. 29, 2012, 30, 2012.

Supreme Court of Delaware.

Submitted: June 7, 2012.
Decided: Aug. 27, 2012.
Reargument Denied: Sept. 21, 2012.

S. Mark Hurd, Esquire and Kevin M. Coen, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Bruce D. Angiolillo, Esquire (argued), Jonathan K. Youngwood, Esquire, Craig S. Waldman, Esquire, and Daniel J. Stujenske, Esquire, Simpson, Thacher & Bartlett LLP, New York, New York, for appellants, Americas Mining Corporation, Germán Larrea Mota–Velasco, Genaro Larrea Mota–Velasco, Oscar Gonzalez Rocha, Emilio Carrillo Gamboa, Jaime Fernando Collazo Gonzalez, Xavier Garcia de Quevedo Topete, Armando Ortega Gómez, and Juan Rebolledo Gout.

Stephen E. Jenkins, Esquire (argued), Richard L. Renck, Esquire, Andrew D. Cordo, Esquire and F. Troupe Mickler, IV, Esquire, Ashby & Geddes, Wilmington, Delaware, for appellant, Nominal Defendant Southern Copper Corporation, formerly known as Southern Peru Copper Corporation.

Ronald A. Brown, Jr., Esquire (argued) and Marcus E. Montejo, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware, and Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER and RIDGELY, Justices and VAUGHN, President Judge,[1] constituting the Court en Banc.

HOLLAND, Justice, for the majority:

This is an appeal from a post-trial decision and final judgment of the Court of Chancery awarding more than $2 billion in damages and more than $304 million in attorneys' fees. The Court of Chancery held that the defendants-appellants, Americas Mining Corporation ("AMC"), the subsidiary of Southern Copper Corporation's ("Southern Peru") controlling shareholder, and affiliate directors of Southern Peru (collectively, the "Defendants"), breached their fiduciary duty of loyalty to Southern Peru and its minority stockholders by causing Southern Peru to acquire the controller's 99.15% interest in a Mexican mining company, Minera México, S.A. de C.V. ("Minera"), for much more than it was worth, *i.e.*, at an unfair price.

The Plaintiff challenged the transaction derivatively on behalf of Southern Peru. The Court of Chancery found the trial evidence established that the controlling shareholder, Grupo México, S.A.B. de C.V. ("Grupo Mexico"), through AMC, "extracted a deal that was far better than market" from Southern Peru due to the ineffective operation of a special committee (the "Special Committee"). To remedy the Defendants' breaches of loyalty, the Court of Chancery awarded the difference between the value Southern Peru paid for Minera ($3.7 billion) and the amount the Court of Chancery determined Minera was worth ($2.4 billion). The Court of Chancery awarded damages in the amount of $1.347 billion plus pre- and post-judgment interest, for a total judgment of $2.0316 billion. The Court of Chancery also awarded the Plaintiff's counsel attorneys' fees and expenses in the amount of 15% of the total judgment, which amounts to more than $304 million.

### Issues on Appeal

The Defendants have raised five issues on appeal. First, they argue that the Court of Chancery impermissibly denied the Defendants the opportunity to present a witness from Goldman, Sachs & Co. ("Goldman") at trial to explain its valuation process, on the grounds that the witness constituted an "unfair surprise." Second, they contend that the Court of Chancery committed reversible error by failing to

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4.

determine which party bore the burden of proof before trial. They further claim the Court of Chancery erred by ultimately allocating the burden to the Defendants, because, they submit, the Special Committee was independent, well-functioning, and did not rely on the controlling shareholder for the information that formed the basis for its recommendation. Third, they argue that the Court of Chancery's determination about the "fair" price for the transaction was arbitrary and capricious. Fourth, they assert that the Court of Chancery's award of damages is not supported by evidence in the record, but rather by impermissible speculation and conjecture. Finally, the Defendants' allege that the Court of Chancery's award of attorneys' fees of more than $304 million is an abuse of discretion. Southern Peru also appeals from the award of attorneys' fees to the Plaintiff's counsel.

We have determined that all of the Defendants' arguments are without merit. Therefore, the judgment of the Court of Chancery is affirmed.

### FACTUAL BACKGROUND [2]

The controlling stockholder in this case is Grupo México, S.A.B. de C.V. The NYSE-listed mining company is Southern Peru Copper Corporation.[3] The Mexican mining company is Minera México, S.A. de C.V.[4]

In February 2004, Grupo Mexico proposed that Southern Peru buy its 99.15% stake in Minera. At the time, Grupo Mexico owned 54.17% of Southern Peru's outstanding capital stock and could exercise 63.08% of the voting power of Southern Peru, making it Southern Peru's majority stockholder.

Grupo Mexico initially proposed that Southern Peru purchase its equity interest in Minera with 72.3 million shares of newly-issued Southern Peru stock. This "indicative" number assumed that Minera's equity was worth $3.05 billion, because that is what 72.3 million shares of Southern Peru stock were worth then in cash. By stark contrast with Southern Peru, Minera was almost wholly owned by Grupo Mexico and therefore had no market-tested value.

Because of Grupo Mexico's self-interest in the merger proposal, Southern Peru formed a "Special Committee" of disinterested directors to "evaluate" the transaction with Grupo Mexico. The Special Committee spent eight months in an awkward back and forth with Grupo Mexico over the terms of the deal before approving Southern Peru's acquisition of 99.15% of Minera's stock in exchange for 67.2 million newly-issued shares of Southern Peru stock (the "Merger") on October 21, 2004. That same day, Southern Peru's board of directors (the "Board") unanimously approved the Merger and Southern Peru and Grupo Mexico entered into a definitive agreement (the "Merger Agreement"). On October 21, 2004, the market value of 67.2 million shares of Southern Peru stock was $3.1 billion. When the Merger closed on April 1, 2005, the value

---

**2.** The facts are taken almost verbatim from the post-trial decision by the Court of Chancery.

**3.** On October 11, 2005, Southern Peru changed its name to "Southern Copper Corporation" and is currently traded on the NYSE under the symbol "SCCO."

**4.** Grupo Mexico held—and still holds—its interest in Southern Peru through its wholly-owned subsidiary Americas Mining Corporation ("AMC"). Grupo Mexico also held its 99.15% stake in Minera through AMC. AMC, not Grupo Mexico, is a defendant to this action, but I refer to them collectively as Grupo Mexico in this opinion because that more accurately reflects the story as it happened.

of 67.2 million shares of Southern Peru had grown to $3.75 billion.

This derivative suit was then brought against the Grupo Mexico subsidiary that owned Minera, the Grupo Mexico-affiliated directors of Southern Peru, and the members of the Special Committee, alleging that the Merger was entirely unfair to Southern Peru and its minority stockholders.

The crux of the Plaintiff's argument is that Grupo Mexico received something demonstrably worth more than $3 billion (67.2 million shares of Southern Peru stock) in exchange for something that was not worth nearly that much (99.15% of Minera).[5] The Plaintiff points to the fact that Goldman, which served as the Special Committee's financial advisor, never derived a value for Minera that justified paying Grupo Mexico's asking price, but instead relied on a "relative" valuation analysis that involved comparing the discounted cash flow ("DCF") values of Southern Peru and Minera, and a contribution analysis that improperly applied Southern Peru's own market EBITDA multiple (and even higher multiples) to Minera's EBITDA projections, to determine an appropriate exchange ratio to use in the Merger. The Plaintiff claims that, because the Special Committee and Goldman abandoned the company's market price as a measure of the true value of the give, Southern Peru substantially overpaid in the Merger.

The Defendants remaining in the case are Grupo Mexico and its affiliate directors who were on the Southern Peru Board at the time of the Merger.[6] These Defen-dants assert that Southern Peru and Minera are similar companies and were properly valued on a relative basis. In other words, the defendants argue that the appropriate way to determine the price to be paid by Southern Peru in the Merger was to compare both companies' values using the same set of assumptions and methodologies, rather than comparing Southern Peru's market capitalization to Minera's DCF value. The Defendants do not dispute that shares of Southern Peru stock could have been sold for their market price at the time of the Merger, but they contend that Southern Peru's market price did not reflect the fundamental value of Southern Peru and thus could not appropriately be compared to the DCF value of Minera.

After this brief overview of the basic events and the parties' core arguments, the Court of Chancery provided the following more detailed recitation of the facts as it found them after trial.

### The Key Players

Southern Peru operates mining, smelting, and refining facilities in Peru, producing copper and molybdenum as well as silver and small amounts of other metals. Before the Merger, Southern Peru had two classes of stock: common shares that were traded on the New York Stock Exchange; and "Founders Shares" that were owned by Grupo Mexico, Cerro Trading Company, Inc., and Phelps Dodge Corporation (the "Founding Stockholders"). Each Founders Share had five votes per share versus one vote per share for ordinary common stock. Grupo Mexico owned 43.3 million Founders Shares, which trans-

---

5. The remaining plaintiff in this action is Michael Theriault, as trustee of and for the Theriault Trust.

6. These individual defendants are Germán Larrea Mota–Velasco, Genaro Larrea Mota–Velasco, Oscar González Rocha, Emilio Carrillo Gamboa, Jaime Fernandez Collazo Gonzalez, Xavier García de Quevedo Topete, Armando Ortega Gómez, and Juan Rebolledo Gout.

lated to 54.17% of Southern Peru's outstanding stock and 63.08% of the voting power.

Southern Peru's certificate of incorporation and a stockholders' agreement also gave Grupo Mexico the right to nominate a majority of the Southern Peru Board. The Grupo Mexico-affiliated directors who are defendants in this case held seven of the thirteen Board seats at the time of the Merger. Cerro owned 11.4 million Founders Shares (14.2% of the outstanding common stock) and Phelps Dodge owned 11.2 million Founders Shares (13.95% of the outstanding common stock). Among them, therefore, Grupo Mexico, Cerro, and Phelps Dodge owned over 82% of Southern Peru.

Grupo Mexico is a Mexican holding company listed on the Mexican stock exchange. Grupo Mexico is controlled by the Larrea family, and at the time of the Merger defendant Germán Larrea was the Chairman and CEO of Grupo Mexico, as well as the Chairman and CEO of Southern Peru. Before the Merger, Grupo Mexico owned 99.15% of Minera's stock and thus essentially was Minera's sole owner. Minera is a company engaged in the mining and processing of copper, molybdenum, zinc, silver, gold, and lead through its Mexico-based mines. At the time of the Merger, Minera was emerging from—if not still mired in—a period of financial difficulties, and its ability to exploit its assets had been compromised by these financial constraints. By contrast, Southern Peru was in good financial condition and virtually debt-free.

### Grupo Mexico Proposes That Southern Peru Acquire Minera

In 2003, Grupo Mexico began considering combining its Peruvian mining interests with its Mexican mining interests. In September 2003, Grupo Mexico engaged

UBS Investment Bank to provide advice with respect to a potential strategic transaction involving Southern Peru and Minera.

Grupo Mexico and UBS made a formal presentation to Southern Peru's Board on February 3, 2004, proposing that Southern Peru acquire Grupo Mexico's interest in Minera from AMC in exchange for newly-issued shares of Southern Peru stock. In that presentation, Grupo Mexico characterized the transaction as "[Southern Peru] to acquire Minera [ ] from AMC in a stock for stock deal financed through the issuance of common shares; initial proposal to issue 72.3 million shares." A footnote to that presentation explained that the 72.3 million shares was "an indicative number" of Southern Peru shares to be issued, assuming an equity value of Minera of $3.05 billion and a Southern Peru share price of $42.20 as of January 29, 2004.

In other words, the consideration of 72.3 million shares was indicative in the sense that Grupo Mexico wanted $3.05 billion in dollar value of Southern Peru stock for its stake in Minera, and the number of shares that Southern Peru would have to issue in exchange for Minera would be determined based on Southern Peru's market price. As a result of the proposed merger, Minera would become a virtually wholly-owned subsidiary of Southern Peru. The proposal also contemplated the conversion of all Founders Shares into a single class of common shares.

### Southern Peru Forms A Special Committee

In response to Grupo Mexico's presentation, the Board met on February 12, 2004 and created a Special Committee to evaluate the proposal. The resolution creating the Special Committee provided that the "duty and sole purpose" of the Special Committee was "to evaluate the [Merger]

in such manner as the Special Committee deems to be desirable and in the best interests of the stockholders of [Southern Peru]," and authorized the Special Committee to retain legal and financial advisors at Southern Peru's expense on such terms as the Special Committee deemed appropriate. The resolution did not give the Special Committee express power to negotiate, nor did it authorize the Special Committee to explore other strategic alternatives.

The Special Committee's makeup as it was finally settled on March 12, 2004 was as follows:

- Harold S. Handelsman: Handelsman graduated from Columbia Law School and worked at Wachtell, Lipton, Rosen & Katz as an M & A lawyer before becoming an attorney for the Pritzker family interests in 1978. The Pritzker family is a wealthy family based in Chicago that owns, through trusts, a myriad of businesses. Handelsman was appointed to the Board in 2002 by Cerro, which was one of those Pritzker-owned businesses.

- Luis Miguel Palomino Bonilla: Palomino has a Ph.D in finance from the Wharton School at the University of Pennsylvania and worked as an economist, analyst and consultant for various banks and financial institutions. Palomino was nominated to the Board by Grupo Mexico upon the recommendation of certain Peruvian pension funds that held a large portion of Southern Peru's publicly traded stock.

- Gilberto Perezalonso Cifuentes: Perezalonso has both a law degree and an MBA and has managed multi-billion dollar companies such as Grupo Televisa and AeroMexico Airlines. Perezalonso was nominated to the Board by Grupo Mexico.

- Carlos Ruiz Sacristán: Ruiz, who served as the Special Committee's Chairman, worked as a Mexican government official for 25 years before co-founding an investment bank, where he advises on M & A and financing transactions. Ruiz was nominated to the Board by Grupo Mexico.

### The Special Committee Hires Advisors And
### Seeks A Definitive Proposal From Grupo Mexico

The Special Committee began its work by hiring U.S. counsel and a financial advisor. After considering various options, the Special Committee chose Latham & Watkins LLP and Goldman. The Special Committee also hired a specialized mining consultant to help Goldman with certain technical aspects of mining valuation. Goldman suggested consultants that the Special Committee might hire to aid in the process; after considering these options, the Special Committee retained Anderson & Schwab ("A & S").

After hiring its advisors, the Special Committee set out to acquire a "proper" term sheet from Grupo Mexico. The Special Committee did not view the most recent term sheet that Grupo Mexico had sent on March 25, 2004 as containing a price term that would allow the Special Committee to properly evaluate the proposal. For some reason the Special Committee did not get the rather clear message that Grupo Mexico thought Minera was worth $3.05 billion.

Thus, in response to that term sheet, on April 2, 2004, Ruiz sent a letter to Grupo Mexico on behalf of the Special Committee in which he asked for clarification about, among other things, the pricing of the proposed transaction. On May 7, 2004, Grupo Mexico sent to the Special Commit-

tee what the Special Committee considered to be the first "proper" term sheet, making even more potent its ask.

### The May 7 Term Sheet

Grupo Mexico's May 7 term sheet contained more specific details about the proposed consideration to be paid in the Merger. It echoed the original proposal, but increased Grupo Mexico's ask from $3.05 billion worth of Southern Peru stock to $3.147 billion. Specifically, the term sheet provided that:

> The proposed value of Minera [ ] is US$4,3 billion, comprised of an equity value of US$3,147 million [sic] and US$1,153 million [sic] of net debt as of April 2004. The number of [Southern Peru] shares to be issued in respect to the acquisition of Minera [ ] would be calculated by dividing 98.84% of the equity value of Minera [ ] by the 20–day average closing share price of [Southern Peru] beginning 5 days prior to closing of the [Merger].[7]

In other words, Grupo Mexico wanted $3.147 billion in market-tested Southern Peru stock in exchange for its stake in Minera. The structure of the proposal, like the previous Grupo Mexico ask, shows that Grupo Mexico was focused on the dollar value of the stock it would receive.

Throughout May 2004, the Special Committee's advisors conducted due diligence to aid their analysis of Grupo Mexico's proposal. As part of this process, A & S visited Minera's mines and adjusted the financial projections of Minera management (*i.e.*, of Grupo Mexico) based on the outcome of their due diligence.

### Goldman Begins To Analyze Grupo Mexico's Proposal

On June 11, 2004, Goldman made its first presentation to the Special Committee addressing the May 7 term sheet. Although Goldman noted that due diligence was still ongoing, it had already done a great deal of work and was able to provide preliminary valuation analyses of the standalone equity value of Minera, including a DCF analysis, a contribution analysis, and a look-through analysis.

Goldman performed a DCF analysis of Minera based on long-term copper prices ranging from $0.80 to $1.00 per pound and discount rates ranging from 7.5% to 9.5%, utilizing both unadjusted Minera management projections and Minera management projections as adjusted by A & S. The only way that Goldman could derive a value for Minera close to Grupo Mexico's asking price was by applying its most aggressive assumptions (a modest 7.5% discount rate and its high-end $1.00/lb long-term copper price) to the unadjusted Minera management projections, which yielded an equity value for Minera of $3.05 billion. By applying the same aggressive assumptions to the projections as adjusted by A & S, Goldman's DCF analysis yielded a lower equity value for Minera of $2.41 billion. Goldman's mid-range assumptions (an 8.5% discount rate and $0.90/lb long–term copper price) only generated a $1.7 billion equity value for Minera when applied to the A & S-adjusted projections. That is, the mid-range of the Goldman analysis generated a value for Minera (the "get") a full $1.4 billion less than Grupo Mexico's ask for the give.

It made sense for Goldman to use the $0.90 per pound long term copper price as a mid-range assumption, because this price

---

**7.** At this point in the negotiation process, Grupo Mexico mistakenly believed that it only owned 98.84% of Minera. It later corrects this error, and the final Merger consideration reflected Grupo Mexico's full 99.15% equity ownership stake in Minera.

was being used at the time by both Southern Peru and Minera for purposes of internal planning. The median long-term copper price forecast based on Wall Street research at the time of the Merger was also $0.90 per pound.

Goldman's contribution analysis applied Southern Peru's market-based sales, EBITDA, and copper sales multiples to Minera. This analysis yielded an equity value for Minera ranging only between $1.1 and $1.7 billion. Goldman's look-through analysis, which was a sum-of-the-parts analysis of Grupo Mexico's market capitalization, generated a maximum equity value for Minera of $1.3 billion and a minimum equity value of only $227 million.

Goldman summed up the import of these various analyses in an "Illustrative Give/Get Analysis," which made patent the stark disparity between Grupo Mexico's asking price and Goldman's valuation of Minera: Southern Peru would "give" stock with a market price of $3.1 billion to Grupo Mexico and would "get" in return an asset worth no more than $1.7 billion.

The important assumption reflected in Goldman's June 11 presentation was that a bloc of shares of Southern Peru could yield a cash value equal to Southern Peru's actual stock market price and was thus worth its market value was emphasized by the Court of Chancery. At trial, the Defendants disclaimed any reliance upon a claim that Southern Peru's stock market price was not a reliable indication of the cash value that a very large bloc of shares—such as the 67.2 million paid to Grupo Mexico—could yield in the market. Thus, the price of the "give" was always easy to discern. The question thus becomes what was the value of the "get." Unlike Southern Peru, Minera's value was not the subject of a regular market test. Minera

shares were not publicly traded and thus the company was embedded in the overall value of Grupo Mexico.

The June 11 presentation clearly demonstrates that Goldman, in its evaluation of the May 7 term sheet, could not get the get anywhere near the give. Notably, that presentation marked the *first and last time* that a give-get analysis appeared in Goldman's presentations to the Special Committee.

The Court of Chancery described what happened next as curious. The Special Committee began to *devalue* the "give" in order to make the "get" look closer in value. The DCF analysis of the value of Minera that Goldman presented initially caused concern. As Handelsman stated at trial, "when [the Special Committee] thought that the value of Southern Peru was its market value and the value of Minera [ ] was its discounted cash flow value ... those were very different numbers."

But, the Special Committee's view changed when Goldman presented it with a DCF analysis of the value of Southern Peru on June 23, 2004. In this June 23 presentation, Goldman provided the Special Committee with a preliminary DCF analysis for Southern Peru analogous to the one that it had provided for Minera in the June 11 presentation. But, the discount rates that Goldman applied to Southern Peru's cash flows ranged from 8% to 10% instead of 7.5% to 9.5%. Based on Southern Peru management's projections, the DCF value generated for Southern Peru using mid-range assumptions (a 9% discount rate and $0.90/lb long-term copper price) was $2.06 billion. This was about $1.1 billion shy of Southern Peru's market capitalization as of June 21, 2004 ($3.19 billion). Those values "comforted" the

Special Committee.[8]

The Court of Chancery found that "comfort" was an odd word for the Special Committee to use in this context. What Goldman was basically telling the Special Committee was that Southern Peru was being overvalued by the stock market. That is, Goldman told the Special Committee that even though Southern Peru's stock was worth an obtainable amount in cash, it really was not worth that much in fundamental terms. Thus, although Southern Peru had an actual cash value of $3.19 billion, its "real," "intrinsic," or "fundamental" value was only $2.06 billion, and giving $2.06 billion in fundamental value for $1.7 billion in fundamental value was something more reasonable to consider.

The Court of Chancery concluded that the more logical reaction of someone not in the confined mindset of directors of a controlled company may have been that it was a good time to capitalize on the market multiple the company was getting and monetize the asset. The Court of Chancery opined that a third party in the Special Committee's position might have sold at the top of the market, or returned cash to the Southern Peru stockholders by declaring a special dividend. For example, if it made long-term strategic sense for Grupo Mexico to consolidate Southern Peru and Minera, there was a logical alternative for the Special Committee: ask Grupo Mexico to make a premium to market offer for Southern Peru. Let Grupo Mexico be the buyer, not the seller.

In other words, the Court of Chancery found that by acting like a third-party negotiator with its own money at stake and with the full range of options, the Special Committee would have put Grupo Mexico

back on its heels. Doing so would have been consistent with the financial advice it was getting and seemed to accept as correct. The Special Committee could have also looked to use its market-proven stock to buy a company at a good price (a lower multiple to earnings than Southern Peru's) and then have its value rolled into Southern Peru's higher market multiple to earnings. That could have included buying Minera at a price equal to its fundamental value using Southern Peru's market-proven currency.

The Court of Chancery was chagrined that instead of doing any of these things, the Special Committee was "comforted" by the fact that they could devalue that currency and justify paying *more* for Minera than they originally thought they should.

### Special Committee Moves Toward Relative Valuation

After the June 23, 2004 presentation, the Special Committee and Goldman began to embrace the idea that the companies should be valued on a relative basis. In a July 8, 2004 presentation to the Special Committee, Goldman included both a revised standalone DCF analysis of Minera and a "Relative Discounted Cash Flow Analysis" in the form of matrices presenting the "indicative number" of Southern Peru shares that should be issued to acquire Minera based on various assumptions. The relative DCF analysis generated a vast range of Southern Peru shares to be issued in the Merger of 28.9 million to 71.3 million. Based on Southern Peru's July 8, 2004 market value of $40.30 per share, 28.9 million shares of Southern Peru stock had a market value of $1.16 billion, and 71.3 million shares were worth $2.87

---

8. Tr. at 159 (Handelsman) ("I think the committee was somewhat comforted by the fact that the DCF analysis of Minera [ ] and the DCF analysis of [Southern Peru] were not as different as the discounted cash flow analysis of Minera [ ] and the market value of Southern Peru.").

billion. In other words, even the highest equity value yielded for Minera by this analysis was short of Grupo Mexico's actual cash value asking price.

The revised standalone DCF analysis applied the same discount rate and long-term copper price assumptions that Goldman had used in its June 11 presentation to updated projections. This time, by applying a 7.5% discount rate and $1.00 per pound long-term copper price to Minera management's projections, Goldman was only able to yield an equity value of $2.8 billion for Minera. Applying the same aggressive assumptions to the projections as adjusted by A & S generated a standalone equity value for Minera of only $2.085 billion. Applying mid-range assumptions (a discount rate of 8.5% and $0.90/lb long-term copper price) to the A & S-adjusted projections yielded an equity value for Minera of only $1.358 billion.

### The Special Committee Makes A Counterproposal
### Suggests A Fixed–Exchange Ratio

After Goldman's July 8 presentation, the Special Committee made a counterproposal to Grupo Mexico. The Court of Chancery noted it was "oddly" not mentioned in Southern Peru's proxy statement describing the Merger (the "Proxy Statement"). In this counterproposal, the Special Committee offered that Southern Peru would acquire Minera by issuing 52 million shares of Southern Peru stock with a then-current market value of $2.095 billion. The Special Committee also proposed implementation of a fixed, rather than a floating, exchange ratio that would set the number of Southern Peru shares issued in the Merger.

From the inception of the Merger, Grupo Mexico had contemplated that the dollar value of the price to be paid by South-ern Peru would be fixed (at a number that was always north of $3 billion), while the number of Southern Peru shares to be issued as consideration would float up or down based on Southern Peru's trading price around the time of closing. But, the Special Committee was uncomfortable with having to issue a variable amount of shares in the Merger. Handelsman testified that, in its evaluation of Grupo Mexico's May 7 term sheet, "it was the consensus of the [Special Committee] that a floating exchange rate was a nonstarter" because "no one could predict the number of shares that [Southern Peru] would have to issue in order to come up with the consideration requested."

The Special Committee wanted a fixed exchange ratio, which would set the number of shares that Southern Peru would issue in the Merger at the time of signing. The dollar value of the Merger consideration at the time of closing would vary with the fluctuations of Southern Peru's market price. According to the testimony of the Special Committee members, their reasoning was that both Southern Peru's stock and the copper market had been historically volatile, and a fixed exchange ratio would protect Southern Peru's stockholders from a situation in which Southern Peru's stock price went down and Southern Peru would be forced to issue a greater number of shares for Minera in order to meet a fixed dollar value. The Court of Chancery found that position was hard to reconcile with the Special Committee and Southern Peru's purported bullishness about the copper market in 2004.

### Grupo Mexico Sticks To Its Demand

In late July or early August, Grupo Mexico responded to the Special Committee's counterproposal by suggesting that Southern Peru should issue in excess of 80 million shares of common stock to purchase Minera. It is not clear on the rec-

ord exactly when Grupo Mexico asked for 80 million shares, but given Southern Peru's trading history at that time, the market value of that consideration would have been close to $3.1 billion, basically the same place where Grupo Mexico had started. The Special Committee viewed Grupo Mexico's ask as too high, which is not surprising given that the parties were apparently a full billion dollars in value apart, and negotiations almost broke down.

But, on August 21, 2004, after what is described as "an extraordinary effort" in Southern Peru's Proxy Statement, Grupo Mexico proposed a new asking price of 67 million shares. On August 20, 2004, Southern Peru was trading at $41.20 per share, so 67 million shares were worth about $2.76 billion on the market, a drop in Grupo Mexico's ask. Grupo Mexico's new offer brought the Special Committee back to the negotiating table.

After receiving two term sheets from Grupo Mexico that reflected the 67 million share asking price, the second of which was received on September 8, 2004, when 67 million shares had risen to be worth $3.06 billion on the market, Goldman made another presentation to the Special Committee on September 15, 2004. In addition to updated relative DCF analyses of Southern Peru and Minera (presented only in terms of the number of shares of Southern Peru stock to be issued in the Merger), this presentation contained a "Multiple Approach at Different EBITDA Scenarios," which was essentially a comparison of Southern Peru and Minera's market-based equity values, as derived from multiples of Southern Peru's 2004 and 2005 estimated (or "E") EBITDA.

Goldman also presented these analyses in terms of the number of Southern Peru shares to be issued to Grupo Mexico, rather than generating standalone values for Minera. The range of shares to be issued

at the 2004E EBITDA multiple (5.0x) was 44 to 54 million; at the 2005E multiple (6.3x) Goldman's analyses yielded a range of 61 to 72 million shares of Southern Peru stock. Based on Southern Peru's $45.34 share price as of September 15, 2004, 61 to 72 million shares had a cash value of $2.765 billion to $3.26 billion.

The Special Committee sent a new proposed term sheet to Grupo Mexico on September 23, 2004. That term sheet provided for a fixed purchase price of 64 million shares of Southern Peru (translating to a $2.95 billion market value based on Southern Peru's then-current closing price). The Special Committee's proposal contained two terms that would protect the minority stockholders of Southern Peru: (1) a 20% collar around the purchase price, which gave both the Special Committee and Grupo Mexico the right to walk away from the Merger if Southern Peru's stock price went outside of the collar before the stockholder vote; and (2) a voting provision requiring that a majority of the minority stockholders of Southern Peru vote in favor of the Merger. Additionally, the proposal called for Minera's net debt, which Southern Peru was going to absorb in the Merger, to be capped at $1.105 billion at closing, and contained various corporate governance provisions.

### The Special Committee's Proposed Terms Rejected
### But The Parties Work Out A Deal

On September 30, 2004, Grupo Mexico sent a counterproposal to the Special Committee, in which Grupo Mexico rejected the Special Committee's offer of 64 million shares and held firm to its demand for 67 million shares. Grupo Mexico's counterproposal also rejected the collar and the majority of the minority vote provision, proposing instead that the Merger be con-

ditioned on the vote of two-thirds of the outstanding stock. Grupo Mexico noted that conditioning the Merger on a two-thirds shareholder vote obviated the need for the walk-away right requested by the Special Committee, because Grupo Mexico would be prevented from approving the Merger unilaterally in the event the stock price was materially higher at the time of the stockholder vote than at the time of Board approval. Grupo Mexico did accept the Special Committee's proposed $1.05 billion debt cap at closing. The Court of Chancery found that was not much of a concession in light of the fact that Minera was already contractually obligated to pay down its debt and was in the process of doing so.

After the Special Committee received Grupo Mexico's September 30 counterproposal, the parties reached agreement on certain corporate governance provisions to be included in the Merger Agreement, some of which were originally suggested by Grupo Mexico and some of which were first suggested by the Special Committee. Without saying these provisions were of no benefit at all to Southern Peru and its outside investors, the Court of Chancery did say that they did not factor more importantly in its decision because they do not provide any benefit above the protections of default law that were economically meaningful enough to close the material dollar value gap that existed.

On October 5, 2004, members of the Special Committee met with Grupo Mexico to iron out a final deal. At that meeting, the Special Committee agreed to pay 67 million shares, dropped their demand for the collar, and acceded to most of Grupo Mexico's demands. The Special Committee justified paying a higher price through what the Court of Chancery described as a series of economic contortions. The Special Committee was able to "bridge the

gap" between the 64 million and the 67 million figures by decreasing Minera's debt cap by another $105 million, and by getting Grupo Mexico to cause Southern Peru to issue a special dividend of $100 million, which had the effect of decreasing the value of Southern Peru's stock. According to Special Committee member Handelsman, these "bells and whistles" made it so that "the value of what was being . . . acquired in the merger went up, and the value of the specie that was being used in the merger went down . . .," giving the Special Committee reason to accept a higher Merger price.

The closing share price of Southern Peru was $53.16 on October 5, 2004, so a purchase price of 67 million shares had a market value of $3.56 billion, which was higher than the dollar value requested by Grupo Mexico in its February 2004 proposal or its original May 7 term sheet.

At that point, the main unresolved issue was the stockholder vote that would be required to approve the Merger. After further negotiations, on October 8, 2004, the Special Committee gave up on its proposed majority of the minority vote provision and agreed to Grupo Mexico's suggestion that the Merger require only the approval of two-thirds of the outstanding common stock of Southern Peru. Given the size of the holdings of Cerro and Phelps Dodge, Grupo Mexico could achieve a two-thirds vote if either Cerro or Phelps Dodge voted in favor of the Merger.

### Multi–Faceted Dimensions Of Controlling Power: Large Stockholders Who Want To Get Out Support A Strategic, Long–Term Acquisition As A Prelude To Their Own Exit As Stockholders

One of the members of the Special Committee, Handelsman, represented a large

Founding Stockholder, Cerro. The Court of Chancery noted that this might be seen in some ways to have ideally positioned Handelsman to be a very aggressive negotiator. But Handelsman had a problem to deal with, which did not involve Cerro having any self-dealing interest in the sense that Grupo Mexico had. Rather, Grupo Mexico had control over Southern Peru and thus over whether Southern Peru would take the steps necessary to make the Founding Stockholders' shares marketable under applicable securities regulations. Cerro and Phelps Dodge wanted to monetize their investment in Southern Peru and get out.

Thus, while the Special Committee was negotiating the terms of the Merger, Handelsman was engaged in negotiations of his own with Grupo Mexico. Cerro and Phelps Dodge had been seeking registration rights from Grupo Mexico (in its capacity as Southern Peru's controller) for their shares of Southern Peru stock, which they needed because of the volume restrictions imposed on affiliates of an issuer by SEC Rule 144.

The Court of Chancery found that it is not clear which party first proposed liquidity and support for the Founding Stockholders in connection with the Merger. But it is plain that the concept appears throughout the term sheets exchanged between Grupo Mexico and the Special Committee, and it is clear that Handelsman knew that registration rights would be part of the deal from the beginning of the Merger negotiations and that thus the deal would enable Cerro to sell as it desired. The Special Committee did not take the lead in negotiating the specific terms of the registration rights provisions—rather, it took the position that it wanted to leave the back-and-forth over the agreement details to Cerro and Grupo Mexico. Handelsman, however, played a key role in the negotiations with Grupo Mexico on Cerro's behalf.

At trial, Handelsman explained that there were two justifications for pursuing registration rights—one offered benefits exclusive to the Founding Stockholders, and the other offered benefits that would inure to Southern Peru's entire stockholder base. The first justification was that Cerro needed the registration rights in order to sell its shares quickly, and Cerro wanted "to get out" of its investment in Southern Peru. The second justification concerned the public market for Southern Peru stock.

Granting registration rights to the Founding Stockholders would allow Cerro and Phelps Dodge to sell their shares, increasing the amount of stock traded on the market and thus increasing Southern Peru's somewhat thin public float. This would in turn improve stockholder liquidity, generate more analyst exposure, and create a more efficient market for Southern Peru shares, all of which would benefit the minority stockholders. Handelsman thus characterized the registration rights situation as a "win-win," because "it permitted us to sell our stock" and "it was good for [Southern Peru] because they had a better float and they had a more organized sale of shares."

Handelsman's tandem negotiations with Grupo Mexico culminated in Southern Peru giving Cerro registration rights for its shares on October 21, 2004, the same day that the Special Committee approved the Merger. In exchange for registration rights, Cerro expressed its intent to vote its shares in favor of the Merger if the Special Committee recommended it. If the Special Committee made a recommendation against the Merger, or withdrew its recommendation in favor of it, Cerro was bound by the agreement to vote against the Merger.

Grupo Mexico's initial proposal, which Handelsman received on October 18, 2004—a mere three days before the Special Committee was to vote on the Merger—was that it would grant Cerro registration rights in exchange for Cerro's agreement to vote in favor of the Merger. The Special Committee and Handelsman suggested instead that Cerro's vote on the Merger be tied to whether or not the Special Committee recommended the Merger. After discussing the matter with the Special Committee, Grupo Mexico agreed.

On December 22, 2004, after the Special Committee approved the Merger but well before the stockholder vote, Phelps Dodge entered into an agreement with Grupo Mexico that was similar to Cerro's, but did not contain a provision requiring Phelps Dodge to vote against the Merger if the Special Committee did. By contrast, Phelps Dodge's agreement only provided that, [t]aking into account that the Special Committee ... did recommend ... the approval of the [Merger], Phelps Dodge "express[es] [its] current intent, to [ ] submit its proxies to vote in favor of the [Merger]. . . . " Thus, in the event that the Special Committee later withdrew its recommendation to approve the Merger, Cerro would be contractually bound to vote against it, but Grupo Mexico could still achieve the two-thirds vote required to approve the Merger solely with Phelps Dodge's cooperation. Under the terms of the Merger Agreement, the Special Committee was free to change its recommendation of the Merger, but it was not able to terminate the Merger Agreement on the basis of such a change. Rather, a change in the Special Committee's recommendation only gave Grupo Mexico the power to terminate the Merger Agreement.

This issue caused the Court of Chancery concern. Although it was not prepared on this record to find that Handelsman consciously agreed to a suboptimal deal for Southern Peru simply to achieve liquidity for Cerro from Grupo Mexico, it had little doubt that Cerro's own predicament as a *stockholder dependent on Grupo Mexico's whim as a controller for registration rights* influenced how Handelsman approached the situation. The Court of Chancery found that did not mean Handelsman consciously gave in, but it did mean that he was less than ideally situated to press hard. Put simply, Cerro was even more subject to the dominion of Grupo Mexico than smaller holders because Grupo Mexico had additional power over it because of the unregistered nature of its shares.

Most important to the Court of Chancery was that Cerro's desires, when considered alongside the Special Committee's actions, illustrate the tendency of control to result in odd behavior. During the negotiations of the Merger, Cerro had no interest in the long-term benefits to Southern Peru of acquiring Minera, nor did Phelps Dodge. Certainly, Cerro did not want any deal so disastrous that it would tank the value of Southern Peru completely, but nor did it have a rational incentive to say no to a suboptimal deal if that risked being locked into its investments.

The Court of Chancery found that Cerro wanted to *sell* and *sell then and there.* But as a Special Committee member, Handelsman did not act consistently with that impulse for all stockholders. He did not suggest that Grupo Mexico make an offer for Southern Peru, but instead pursued a long–term strategic transaction in which Southern Peru was the buyer. Accordingly, the Court of Chancery concluded that a short-term seller of a company's shares caused that company to be a long-term buyer.

### After One Last Price Adjustment, Goldman Makes Its Final Presentation

On October 13, 2004, Grupo Mexico realized that it owned 99.15% of Minera rather than 98.84%, and the purchase price was adjusted to 67.2 million shares instead of 67 million shares to reflect the change in size of the interest being sold. On October 13, 2004, Southern Peru was trading at $45.90 per share, which meant that 67.2 million shares had a dollar worth of $3.08 billion.

On October 21, 2004, the Special Committee met to consider whether to recommend that the Board approve the Merger. At that meeting, Goldman made a final presentation to the Special Committee. The October 21, 2004 presentation stated that Southern Peru's implied equity value was $3.69 billion based on its then current market capitalization at a stock price of $46.41 and adjusting for debt. Minera's implied equity value is stated as $3.146 billion, which was derived entirely from multiplying 67.2 million shares by Southern Peru's $46.41 stock price and adjusting for the fact that Southern Peru was only buying 99.15% of Minera.

No standalone equity value of Minera was included in the Goldman October 21 presentation.[9] Instead, the presentation included a series of relative DCF analyses and a "Contribution Analysis at Different EBITDA Scenarios," both of which were presented in terms of a hypothetical num- ber of Southern Peru shares to be issued to Grupo Mexico for Minera. Goldman's relative DCF analyses provided various matrices showing the number of shares of Southern Peru that should be issued in exchange for Minera under various assumptions regarding the discount rate, the long-term copper price, the allocation of tax benefits, and the amount of royalties that Southern Peru would need to pay to the Peruvian government.

As it had in all of its previous presentations, Goldman used a range of long-term copper prices from $0.80 to $1.00 per pound. The DCF analyses generated a range of the number of shares to be issued in the Merger from 47.2 million to 87.8 million. Based on the then-current stock price of $45.92, this translated to $2.17 billion to $4.03 billion in cash value. Assuming the mid-range figures of a discount rate of 8.5% and a long-term copper price of $0.90 per pound, the analyses yielded a range of shares from 60.7 to 78.7 million.

Goldman's contribution analysis generated a range of 42 million to 56 million shares of Southern Peru to be issued based on an annualized 2004E EBITDA multiple (4.6x) and forecasted 2004E EBITDA multiple (5.0x), and a range of 53 million to 73 million shares based on an updated range of estimated 2005E EBITDA multiples (5.6x to 6.5x). Notably, the 2004E EBITDA multiples did not support the issuance of 67.2 million shares of Southern Peru stock in the Merger. But,

9. During discovery, two Microsoft Excel worksheets were unearthed that appear to suggest the implied equity values of Minera and Southern Peru that underlie Goldman's October 21 presentation. One worksheet, which contains the Minera model, indicates an implied equity value for Minera of $1.25 billion using a long-term copper price of $0.90/lb and a discount rate of 8.5%. The other worksheet, which contains the Southern Peru model, indicates an implied equity value for Southern Peru of $1.6 billion using a copper price of $0.90 and a discount rate of 9.0%, and assuming a royalty tax of 2%. Both the Plaintiff's expert and the Defendants' expert relied on the projections contained in these worksheets in their reports. The Defendants have also not contested the Plaintiff's expert's contention that these worksheets include Goldman's discounted cash flow estimates as of October 21, 2004.

67.2 million shares falls at the higher end of the range of shares calculated using Southern Peru's 2005E EBITDA multiples.

As notable, these multiples were not the product of the median of the 2005E EBITDA multiples of comparable companies identified by Goldman (4.8x). Instead, the multiples used were even higher than Southern Peru's own higher 2005E EBITDA Wall Street consensus (5.5x)—an adjusted version of which was used as the bottom end of the range. These higher multiples were then attributed to Minera, a non-publicly traded company suffering from a variety of financial and operational problems.

Goldman opined that the Merger was fair from a financial perspective to the stockholders of Southern Peru, and provided a written fairness opinion.

### Special Committee And Board Approve The Merger

After Goldman made its presentation, the Special Committee voted 3–0 to recommend the Merger to the Board. At the last-minute suggestion of Goldman, Handelsman decided not to vote in order to remove any appearance of conflict based on his participation in the negotiation of Cerro's registration rights, despite the fact that he had been heavily involved in the negotiations from the beginning and his hands had been deep in the dough of the now fully baked deal. The Board then unanimously approved the Merger and Southern Peru entered into the Merger Agreement.

### Market Reacts To The Merger

The market reaction to the Merger was mixed and the parties have not presented any reliable evidence about it. That is, neither party had an expert perform an event study analyzing the market reaction to the Merger. Southern Peru's stock price traded down by 4.6% when the Merger was announced. When the preliminary proxy statement, which provided more financial information regarding the Merger terms, became public on November 22, 2004, Southern Peru's stock price again declined by 1.45%. But the stock price increased for two days after the final Proxy Statement was filed.

The Court of Chancery found that determining what effect the Merger itself had on this rise is difficult because, as the Plaintiff pointed out, this was not, as the Defendants contended, the first time that Southern Peru and Minera's financials were presented together. Rather, the same financial statements were in the preliminary Proxy Statement and the stock price fell. However, the Court of Chancery noted that the Plaintiff offered no evidence that these stock market fluctuations provided a reliable basis for assessing the fairness of the deal because it did not conduct a reliable event study.

The Court of Chancery found, in fact, against a backdrop of strong copper prices, the trading price of Southern Peru stock increased substantially by the time the Merger closed. By April 1, 2005, Southern Peru's stock price had a market value of $55.89 per share, an increase of approximately 21.7% over the October 21, 2004 closing price. The Court of Chancery found this increase could not be attributed to the Merger because other factors were in play. That included the general direction of copper prices, which lifted the market price of not just Southern Peru, but those of its publicly traded competitors. Furthermore, Southern Peru's own financial performance was very strong.

### Goldman Does Not Update Its Fairness Analysis

Despite rising Southern Peru share prices and performance, the Special Com-

mittee did not ask Goldman to update its fairness analysis at the time of the stockholder vote on the Merger and closing—nearly five months after the Special Committee had voted to recommend it. At trial, Handelsman testified that he called a representative at Goldman to ask whether the transaction was still fair, but the Court of Chancery found that Handelsman's phone call hardly constitutes a request for an updated fairness analysis. The Court of Chancery also found that the Special Committee's failure to determine whether the Merger was still fair at the time of the Merger vote and closing was curious for two reasons.

First, for whatever the reason, Southern Peru's stock price had gone up substantially since the Merger was announced in October 2004. In March 2005, Southern Peru stock was trading at an average price of $58.56 a share. The Special Committee had agreed to a collarless fixed exchange ratio and did not have a walk-away right. The Court of Chancery noted an adroit Special Committee would have recognized the need to re-evaluate the Merger in light of Southern Peru's then-current stock price.

Second, Southern Peru's actual 2004 EBITDA became available before the stockholder vote on the Merger took place, and Southern Peru had smashed through the projections that the Special Committee had used for it. In the October 21 presentation, Goldman used a 2004E EBITDA for Southern Peru of $733 million and a 2004E EBITDA for Minera of $687 million. Southern Peru's actual 2004 EBITDA was $1.005 billion, 37% more and almost $300 million more than the projections used by Goldman. Minera's actual 2004 EBITDA, by contrast, was $681 million, 0.8% less than the projections used by Goldman.

The Court of Chancery noted that earlier, in Goldman's contribution analysis it relied on the values (measured in Southern Peru shares) generated by applying an aggressive range of Southern Peru's 2005E EBITDA multiples to Minera's A & S-adjusted and unadjusted projections, not the 2004E EBITDA multiple, and that the inaccuracy of Southern Peru's estimated 2004 EBITDA should have given the Special Committee serious pause. If the 2004 EBITDA projections of Southern Peru—which were not optimized and had been prepared by Grupo Mexico-controlled management—were so grossly low, it provided reason to suspect that the 2005 EBITDA projections, which were even lower than the 2004 EBITDA projections, were also materially inaccurate, and that the assumptions forming the basis of Goldman's contribution analysis should be reconsidered.

Moreover, Southern Peru made $303.4 million in EBITDA in the first quarter of 2005, over 52% of the estimate in Goldman's fairness presentation for Southern Peru's 2005 full year performance. Although the first-quarter 2005 financial statements, which covered the period from January 1, 2005 to March 31, 2005, would not have been complete by the time of the stockholder vote, the Court of Chancery reasonably assumed that, as directors of Southern Peru, the Special Committee had access to nonpublic information about Southern Peru's monthly profit and loss statements. Southern Peru later beat its EBITDA projections for 2005 by a very large margin, 135%, a rate well ahead of Minera's 2005 performance, which beat the deal estimates by a much lower 45%.

The Special Committee's failure to get a fairness update was even more of a concern to the Court of Chancery because Cerro had agreed to vote against the Merger if the Special Committee changed

its recommendation. The Special Committee failed to obtain a majority of the minority vote requirement, but it supposedly agreed to a two-thirds vote requirement instead because a two-thirds vote still prevented Grupo Mexico from unilaterally approving the Merger. This out was only meaningful, however, if the Special Committee took the recommendation process seriously. If the Special Committee maintained its recommendation, Cerro had to vote for the Merger, and its vote combined with Grupo Mexico's vote would ensure passage. By contrast, if the Special Committee changed its recommendation, Cerro was obligated to vote against the Merger.

The Court of Chancery found the tying of Cerro's voting agreement to the Special Committee's recommendation was somewhat odd, in another respect. In a situation involving a third-party merger sale of a company without a controlling stockholder, the third party will often want to lock up some votes in support of a deal. A large blocholder and the target board might therefore negotiate a compromise, whereby the blocholder agrees to vote yes if the target board or special committee maintains a recommendation in favor of the transaction. In this situation, however, there is a factor not present here. In an arm's-length deal, the target usually has the flexibility to change its recommendation or terminate the original merger upon certain conditions, including if a superior proposal is available, or an intervening event makes the transaction impossible to recommend in compliance with the target's fiduciary duties.

Here, by contrast, Grupo Mexico faced no such risk of a competing superior proposal because it controlled Southern Peru. Furthermore, the fiduciary out that the Special Committee negotiated for in the Merger agreement provided only that the Special Committee could change its recom-

mendation in favor of the Merger, not that it could terminate the Merger altogether or avoid a vote on the Merger. The only utility therefore of the recommendation provision was if the Special Committee seriously considered the events between the time of signing and the stockholder vote and made a renewed determination of whether the deal was fair. The Court of Chancery found there is no evidence of such a serious examination, despite important emerging evidence that the transaction's terms were skewed in favor of Grupo Mexico.

### Southern Peru's Stockholders Approve The Merger

On March 28, 2005, the stockholders of Southern Peru voted to approve the Merger. More than 90% of the stockholders voted in favor of the Merger. The Merger then closed on April 1, 2005. At the time of closing, 67.2 million shares of Southern Peru had a market value of $3.75 billion.

### Cerro Sells Its Shares

On June 15, 2005, Cerro, which had a basis in its stock of only $1.32 per share, sold its entire interest in Southern Peru in an underwritten offering at $40.635 per share. Cerro sold its stock at a discount to the then-current market price, as the low-high trading prices for one day before the sale were $43.08 to $44.10 per share. The Court of Chancery found that this illustrated Cerro's problematic incentives.

### Plaintiff Sues Defendants and Special Committee

This derivative suit challenging the Merger, first filed in late 2004, moved too slowly, and it was not until June 30, 2010 that the Plaintiff moved for summary judgment. On August 10, 2010, the Defendants filed a cross-motion for summary judgment, or in the alternative, to shift the burden of proof to the Plaintiff under the

entire fairness standard. On August 11, 2010, the individual Special Committee defendants cross-moved for summary judgment on all claims under Southern Peru's exculpatory provision adopted under title 8, section 102(b)(7) of the Delaware Code.

At a hearing held on December 21, 2010, the Court of Chancery dismissed the Special Committee defendants from the case because the plaintiff had failed to present evidence supporting a non-exculpated breach of their fiduciary duty of loyalty. It denied all other motions for summary judgment. The Court of Chancery noted that this, of course, did not mean that the Special Committee had acted adroitly or that the remaining defendants, Grupo Mexico and its affiliates, were immune from liability.

In contrast to the Special Committee defendants, precisely because the remaining directors were employed by Grupo Mexico, which had a self-dealing interest directly in conflict with Southern Peru, the exculpatory charter provision was of no benefit to them at that stage, given the factual question regarding their motivations. At trial, these individual Grupo Mexico-affiliated director defendants made no effort to show that they acted in good faith and were entitled to exculpation despite their lack of independence. In other words, the Grupo Mexico-affiliated directors did nothing to distinguish each other and none of them argued that he should not bear liability for breach of the duty of loyalty if the transaction was unfairly advantageous to Grupo Mexico, which had a direct self-dealing interest in the Merger. Accordingly, the Court of Chancery concluded that their liability would rise or fall with the issue of fairness.

In dismissing the Special Committee members on the summary judgment record, the Court of Chancery necessarily treated the predicament faced by Cerro and Handelsman, which involved facing additional economic pressures as a minority stockholder as a result of Grupo Mexico's control, differently than a classic self-dealing interest. The Court of Chancery continued to hold that view. Although it believed that Cerro, and therefore Handelsman, were influenced by Cerro's desire for liquidity as a stockholder, it seemed counterproductive to the Court of Chancery to equate a legitimate concern of a stockholder for liquidity from a controller into a self-dealing interest.

Therefore, the Court of Chancery concluded that there had to be a triable issue regarding whether Handelsman acted in subjective bad faith to force him to trial. The Court of Chancery concluded then on that record that no such issue of fact existed and even on the fuller trial record (where the Plaintiff actually made much more of an effort to pursue this angle), it still could not find that Handelsman acted in bad faith to purposely accept an unfair deal.

Nevertheless, the Court of Chancery found that Cerro, and therefore Handelsman, did have the sort of economic concern that ideally should have been addressed upfront and forthrightly in terms of whether the stockholder's interest well positioned its representative to serve on a special committee. Thus, although the Court of Chancery continued to be unpersuaded that it could label Handelsman as having acted with the state of mind required to expose him to liability, given the exculpatory charter protection to which he is entitled, it was persuaded that Cerro's desire to sell influenced how Handelsman approached his duties and compromised his effectiveness.

### TRIAL SCHEDULE PROPERLY MAINTAINED

■ The Defendants' first argument is that the Court of Chancery erred by ex-

cluding the testimony of James Del Favero regarding the advice given to the Special Committee by its financial advisor, Goldman, on the ground that Del Favero was identified too late and allowing him to testify would be unfair to the Plaintiff. The Plaintiff contends that the Court of Chancery exercised sound discretion by refusing to modify the stipulated trial schedule in order to permit a new Goldman witness (Del Favero) to be deposed and testify weeks after the trial was scheduled to have concluded, when a video-taped deposition of the Special Committee's actual Goldman advisor was already in the record. Both parties agree, however, that whether the trial judge's ruling is characterized as an exclusion of evidence or a refusal to change the trial scheduling order, either action is reviewed on appeal for an abuse of discretion.[10]

The record reflects that the Plaintiff obtained commissions for deposing three of the six members of the Goldman team identified in Goldman's pitch book to the Special Committee. By agreement of the parties, the Plaintiff deposed Martin Sanchez ("Sanchez") who was the head member of the Goldman team that advised the Special Committee. Sanchez was apparently the Goldman person to whom the Special Committee spoke most often.

Sanchez was deposed on October 21, 2009. He had not worked at Goldman since 2006. Accordingly, at the time of Sanchez's 2009 deposition, the Defendants were aware that neither they nor Goldman could control whether Sanchez would appear at trial. Sanchez's deposition was videotaped. Therefore, it was not simply a cold transcript.

The June 20, 2011 trial date was stipulated to by the parties and set by order of the Court of Chancery on February 10, 2011. On May 31, 2011, the Defendants notified the Plaintiff that Sanchez may not appear to testify at trial. The Defendants assert that they immediately began a search—three weeks before trial—for an alternative Goldman witness who would be available to testify. Their initial choice, however, was not Del Favero.

On June 9, 2011, when the Defendants informed the Plaintiff that Sanchez was "definitely not showing up" for trial, they identified Martin Werner ("Werner"), another Goldman member of the Special Committee advisory team, as their witness for trial. The Plaintiff did not object to the late identification of Werner but did seek to confirm that he would be able to depose Werner before trial. The Defendants' attorney responded, "Of course. I am not optimistic that we will get him to trial, in which case we will have no live Goldman witness."

On Monday, June 13, 2011, just twenty-four hours before the pretrial stipulation was due and one week before trial was scheduled to commence, the Defendants proposed for the first time that they call Del Favero as their live Goldman witness at trial. Unlike Sanchez or Werner, Del Favero was not offered to testify about the advice Goldman provided to the Special Committee, but rather about Goldman's internal processes relating to issuing fairness opinions. In proposing to call Del Favero as a witness, the Defendants stated: "We know that Your Honor had commented on[,] at the summary judgment hearing[,] the fairness opinion review process at Goldman Sachs and had some questions about that. We believe that he

10. *Barrow v. Abramowicz*, 931 A.2d 424, 429 (Del.2007); *Sammons v. Doctors for Emergen-* *cy Servs., P.A.*, 913 A.2d 519, 528 (Del.2006).

would be in a position to answer those questions."

Del Favero was not available to either testify during the long-established June trial dates or to be deposed before trial began on June 20. The Defendants suggested that Del Favero be deposed after every other trial witness had testified, and that the trial schedule be modified to reconvene sometime in July to allow Del Favero to testify several weeks after the trial was scheduled to conclude.

At the pretrial conference, the Plaintiff objected to the Defendants' proposal regarding Del Favero for several reasons. First, the Plaintiff argued that allowing Del Favero to be deposed and then testify after every other trial witness had testified, and the trial was otherwise concluded, would be unfair. Second, the Plaintiff objected to Del Favero's testimony because it was not directly relevant to the issues to be presented at trial since Del Favero was not a member of the Goldman team that advised the Special Committee, and had only attended one Special Committee meeting, during which Goldman only pitched its services. Third, the Plaintiff objected to the subject matter to which Del Favero would testify because it was the same subject matter on which counsel for Goldman and the Special Committee had precluded the Plaintiff from inquiring about at Sanchez's deposition.

The Court of Chancery held that Del Favero's inability to testify during the scheduled trial dates, or even to be deposed before the trial began, would unfairly prejudice the Plaintiff. In the Court of Chancery and on appeal, the Defendants assert that a live Goldman witness was central to their defense in light of the trial judge's comments made at the December 2010 summary judgment argument. In denying the Defendants' request to depose and to call Del Favero as a witness several

weeks after the trial was scheduled to end, the trial judge noted that if his comments six months earlier at the summary judgment argument had caused the Defendants to reconsider their witness selection,

> [T]hen I expect that you would have promptly identified this gentleman as a relevant witness and made him available for deposition. It's simply not fair to the plaintiffs.

> Because the other thing about people who want to be witnesses is they get deposed, and when they get deposed, you learn things, and you might ask other people or shape your trial strategy differently. It just adds an unfair element of surprise. And in the 1930s, we decided with the Rules of Civil Procedure to eliminate surprise, at least insofar as your opponent was diligent and asked questions.

> It's regrettable that the lead banker [Sanchez] for a client, even with the passage of time, would decline coming to testify. I understand he may be at a different institution, but, you know, he was the lead banker.

> So I'll watch the [Sanchez] video and we'll deal with it then. Otherwise, we have a fairly truncated set-up of live witnesses; correct?

On appeal, the Defendants assert that "[i]t is difficult to see any harm—let alone unfair harm" if the bench trial had to be reconvened after several weeks to permit Del Favero to be deposed and to testify because the Plaintiff "allowed this case to languish unprosecuted for many years." The Defendants also argue, for the first time on appeal, that if deposing Del Favero after all "other trial testimony would have been problematic, the only fair solution would have been to postpone [commencement] of the trial for a short period to avoid prejudicing the Defendants."

Accordingly, the Defendants contend that the Court of Chancery's refusal to either postpone the commencement of the trial or to reconvene the trial should be reversed because "[a]llowing a proposed trial schedule to dictate which testimony can and cannot be presented by the parties would be the 'tail wagging the dog.'" That argument reflects a fundamental misunderstanding of both fact and law. First, as a matter of fact, the June 20 start date for the trial was not proposed. It had been fixed by court order months earlier in February, with the agreement of the parties. Second, as a matter of law, to use the Defendants' analogy, a trial scheduling order is the dog and not the tail.

■ This Court has stated that "[p]arties must be mindful that scheduling orders are not merely guidelines but have [the same] full force and effect" as any other court order.[11] Once the trial dates are set, the trial judge (the dog's handler) determines whether there is a manifest necessity for amending the trial scheduling order (changing the pace or direction of the dog). That determination is entrusted to the trial judge's discretion.[12]

The record reflects that the trial judge refused to change the trial scheduling order to accommodate Del Favero's availability. The trial judge did not exclude Del Favero's testimony. Nor did the trial judge exclude trial testimony from any other Goldman witness. Sanchez was deposed, and the trial judge specifically stated he would "watch the video" of Sanchez's deposition. Because the trial judge excluded no testimony, this case is significantly different from the facts in the two cases relied upon by the Defendants, *Drejka v. Hitchens Tire Service, Inc.*,[13] and *Sheehan v. Oblates of St. Francis de Sales.*[14]

■ The Defendants' contention that the Court of Chancery committed reversible error because Del Favero's availability "could easily be accommodated during a bench trial" continues its misconception of the judicial process. Trial judges are vested with the discretion to resolve scheduling matters and to control their own docket.[15] When an act of judicial discretion is at issue on appeal, this Court cannot substitute its opinion of what is right for that of the trial judge, if the trial judge's opinion was based upon conscience and reason, as opposed to arbitrariness or capriciousness.[16]

The Court of Chancery's decision was neither arbitrary nor capricious. The Defendants sought to modify the stipulated trial schedule at the eleventh hour by requesting that the trial proceed on June 20, as scheduled, but then be continued until "sometime" in July, and that Del Favero be deposed and testify after every other trial witness had testified. The Court of Chancery ruled this was "simply not fair to the plaintiffs." The Court of Chancery noted that when witnesses "get deposed, you learn things, and you might ask other people or shape your trial strategy differently." The Court of Chancery also noted that if the Defendants had truly been concerned about having a live Goldman witness testify at trial, they could "have

11. *Sammons v. Doctors for Emergency Servs., P.A.*, 913 A.2d at 528.

12. *Id.*

13. *Drejka v. Hitchens Tire Serv., Inc.*, 15 A.3d 1221, 1223–24 (Del.2010).

14. *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1253 (Del.2011).

15. *Drejka v. Hitchens Tire Serv., Inc.*, 15 A.3d at 1222–24.

16. *Sammons v. Doctors for Emergency Servs., P.A.*, 913 A.2d at 528.

promptly identified this gentleman as a relevant witness and made him available for deposition."

The Defendants' assertion that they were prejudiced by not being able to present Del Favero's live testimony at trial is undermined by the record. First, several days before the trial was scheduled to commence, the Defendants acknowledged that they might not have a live Goldman witness to present at trial. Therefore, they would have to rely on the videotaped deposition of Sanchez. Second, in making their post-trial entire fairness arguments to the Court of Chancery, the Defendants stated "the record here is replete with evidence showing what Goldman Sachs did and why."

Del Favero was not available to be deposed, let alone to offer trial testimony, until weeks after the testimony of every other trial witness concluded. The Court of Chancery found the nature of the Defendants' eleventh-hour request to modify the long-standing trial dates would have been unfair to the Plaintiff. That finding is supported by the record and the product of a logical deductive reasoning process. We hold that the Court of Chancery properly exercised its discretion by refusing to modify the stipulated trial scheduling order to accommodate Del Favero's availability.

### BURDEN SHIFTING ANALYSIS

■ The Defendants' second argument on appeal is that the Court of Chancery committed reversible error by failing to determine which party bore the burden of proof before trial. The Defendants submit that the Court of Chancery further erred by ultimately allocating the burden to the Defendants, because the Special Committee was independent, was well-functioning, and did not rely on the controlling shareholder for the information that formed the basis for its recommendation.

■ When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion.[17] In other words, the defendants bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders. In the Court of Chancery and on appeal, both the Plaintiff and the Defendants agree that entire fairness is the appropriate standard of judicial review for the Merger.[18]

■■ The entire fairness standard has two parts: fair dealing and fair price.[19] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[20] Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[21]

17. *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del.1997); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983); *see also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del.1985).

18. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1221 (Del.1999); *Kahn v. Tremont Corp.*, 694 A.2d at 428–29.

19. *Weinberger v. UOP, Inc.*, 457 A.2d at 711.

20. *Id.*

21. *Id.* (citations omitted).

 In *Kahn v. Lynch Communication Systems, Inc.*,[22] this Court held that when the entire fairness standard applies, the defendants may shift the burden of persuasion by one of two means: first, they may show that the transaction was approved by a well-functioning committee of independent directors; or second, they may show that the transaction was approved by an informed vote of a majority of the minority shareholders.[23] Nevertheless, even when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders or a well-functioning committee of independent directors, an entire fairness analysis is the only proper standard of review.[24] Accordingly, "[r]egardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard."[25]

In *Emerald Partners v. Berlin*,[26] we noted that "[w]hen the standard of review is entire fairness, *ab initio*, director defendants can move for summary judgment on either the issue of entire fairness or the issue of burden shifting."[27] In this case, the Defendants filed a summary judgment motion, arguing that the Special Committee process shifted the burden of persuasion under the preponderance standard to the Plaintiff. The Court of Chancery found the summary judgment record was insufficient to determine that question of burden shifting prior to trial.

 *Lynch* and its progeny[28] set forth what is required of an independent committee for the defendants to obtain a burden shift. In this case, the Court of Chancery recognized that, in *Kahn v. Tremont Corp.*,[29] this Court held that "[t]o obtain the benefit of a burden shifting, the controlling shareholder must do more than establish a perfunctory special committee of outside directors."[30] Rather, the special committee must "function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power 'at an arms-length.'"[31] In this case, the Court of Chancery properly concluded that:

A close look at *Tremont* suggests that the [burden shifting] inquiry must focus on how the special committee actually negotiated the deal—was it "well functioning"[32]—rather than just how the committee was set up. The test, there-

---

**22.** *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del.1994).

**23.** *See id.* at 1117 (citation omitted).

**24.** *Id.*

**25.** *Kahn v. Tremont Corp.*, 694 A.2d at 428 (citation omitted).

**26.** *Emerald Partners v. Berlin*, 787 A.2d 85 (Del.2001).

**27.** *Id.* at 98–99.

**28.** *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1222–23 (Del.1999) (describing that the special committee must exert "real bargaining power" in order for defendants to obtain a burden shift); *see also Beam v. Stewart*, 845 A.2d 1040, 1055 n. 45 (Del.2004) (noting that the test articulated in *Tremont* requires a determination as to whether the committee members *"in fact"* functioned independently (citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 429–30 (Del.1997))).

**29.** *Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997).

**30.** *Id.* at 429 (citation omitted).

**31.** *Id.* (citation omitted).

**32.** *Id.* at 428.

fore, seems to contemplate a look back at the substance, and efficacy, of the special committee's negotiations, rather than just a look at the composition and mandate of the special committee.[33]

The Court of Chancery expressed its concern about the practical implications of such a factually intensive burden shifting inquiry because it is "deeply enmeshed" in the ultimate entire fairness analysis.

Subsuming within the burden shift analysis questions of whether the special committee was substantively effective in its negotiations with the controlling stockholder—questions fraught with factual complexity—will, absent unique circumstances, guarantee that the burden shift will rarely be determinable on the basis of the pretrial record alone.[34] If we take seriously the notion, as I do, that a standard of review is meant to serve as the framework through which the court evaluates the parties' evidence and trial testimony in reaching a decision, and, as important, the framework through which the litigants determine how best to prepare their cases for trial,[35] it is problematic to adopt an analytical approach whereby the burden allocation can only be determined in a post-trial opinion, after all the evidence and

all the arguments have been presented to the court.

We agree with these thoughtful comments. However, the general inability to decide burden shifting prior to trial is directly related to the reason why entire fairness remains the applicable standard of review even when an independent committee is utilized, i.e., "because the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny."[36]

This case is a perfect example. The Court of Chancery could not decide whether to shift the burden based upon the pretrial record. After hearing all of the evidence presented at trial, the Court of Chancery found that, although the independence of the Special Committee was not challenged, "from inception, the Special Committee fell victim to a controlled mindset and allowed Grupo Mexico to dictate the terms and structure of the merger." The Court of Chancery concluded that "although the Special Committee members were competent businessmen and may have had the best of intentions, they allowed themselves to be hemmed in by the controlling stockholder's demands."

We recognize that there are practical problems for litigants when the issue of

**33.** *Accord Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d at 1121 ("[U]nless the controlling or dominating shareholder can demonstrate that it has not only formed an independent committee but also replicated a process 'as though each of the contending parties had in fact exerted its bargaining power at arm's length,' the burden of proving entire fairness will not shift." (citing *Weinberger v. UOP, Inc.,* 457 A.2d 701, 709–10 n. 7 (Del.1983))).

**34.** *Cf. In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 549 (Del.Ch.2003).

**35.** *See* William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 Bus. L.

1287, 1303–04 n. 63 (2001) (noting the practical problems litigants face when the burden of proof they are forced to bear is not made clear until after the trial); *cf. In re Cysive, Inc. S'holders Litig.,* 836 A.2d at 549.

**36.** *Kahn v. Tremont Corp.,* 694 A.2d at 428 (citing *Weinberger v. UOP, Inc.,* 457 A.2d at 710). *See also In re Cox Commc'ns, Inc. S'holders Litig.,* 879 A.2d 604, 617 (Del.Ch. 2005) ("All in all, it is perhaps fairest and more sensible to read *Lynch* as being premised on a sincere concern that mergers with controlling stockholders involve an extraordinary potential for the exploitation by powerful insiders of their informational advantages and their voting clout.").

burden shifting is not decided until after the trial.[37] For example, "in order to prove that a burden shift occurred because of an effective special committee, the defendants must present evidence of a fair process. Because they must present this evidence affirmatively, they have to act like they have the burden of persuasion throughout the entire trial court process." [38] That is exactly what happened in this case.

Delaware has long adhered to the principle that the controlling shareholders have the burden of proving an interested transaction was entirely fair.[39] However, in order to encourage the use of procedural devices that foster fair pricing, such as special committees and minority stockholder approval conditions, this Court has provided transactional proponents with what has been described as a *modest procedural benefit*—the shifting of the burden of persuasion on the ultimate issue of entire fairness to the plaintiffs—if the transaction proponents proved, in a factually intensive way, that the procedural devices had, in fact, operated with integrity." [40] We emphasize that in *Cox*, the procedural benefit of burden shifting was characterized as "modest."

Once again, in this case, the Court of Chancery expressed uncertainty about whether "there is much, if any, practical implication of a burden shift." According to the Court of Chancery, "[t]he practical effect of the *Lynch* doctrine's burden shift is slight. One reason why this is so is that

shifting the burden of persuasion under a preponderance standard is not a major move, if one assumes . . . that the outcome of very few cases hinges on what happens if . . . the evidence is in equipoise." [41]

In its post-trial opinion, the Court of Chancery found that the burden of persuasion remained with the Defendants, because the Special Committee was not "well functioning." [42] The trial judge also found, "however, that this determination matters little because I am not stuck in equipoise about the issue of fairness. Regardless of who bears the burden, I conclude that the Merger was unfair to Southern Peru and its stockholders."

Nothing in the record reflects that a different outcome would have resulted if either the burden of proof had been shifted to the Plaintiff, or the Defendants had been advised prior to trial that the burden had not shifted. The record reflects that, by agreement of the parties, each witness other than the Plaintiff's expert was called in direct examination by the Defendants, and then was cross-examined by the Plaintiff. The Defendants have not identified any decision they might have made differently, if they had been advised prior to trial that the burden of proof had not shifted.

The Court of Chancery concluded that this is not a case where the evidence of fairness or unfairness stood in equipoise. It found that the evidence of unfairness was so overwhelming that the question of who had the burden of proof at trial was

37. William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. L. 1287, 1303–04 n. 63 (2001).

38. *In re Cysive, Inc. S'holders Litig.*, 836 A.2d at 549.

39. *Kahn v. Tremont Corp.*, 694 A.2d at 428–29.

40. *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d at 617 (emphasis added).

41. *In re Cysive, Inc. S'holders Litig.*, 836 A.2d at 548.

42. *Kahn v. Tremont Corp.*, 694 A.2d at 428.

irrelevant to the outcome. That determination is supported by the record. The Court of Chancery committed no error by not allocating the burden of proof before trial, in accordance with our prior precedents. In the absence of a renewed request by the Defendants during trial that the burden be shifted to the Plaintiff, the burden of proving entire fairness remained with the Defendants throughout the trial.[43] The record reflects that is how the trial in this case was conducted.

Nevertheless, we recognize that the purpose of providing defendants with the opportunity to seek a burden shift is not only to encourage the use of special committees,[44] but also to provide a reliable pretrial guide for the parties regarding who has the burden of persuasion.[45] Therefore, which party bears the burden of proof must be determined, if possible, before the trial begins. The Court of Chancery has noted that, in the interest of having certainty, "it is unsurprising that few defendants have sought a pretrial hearing to determine who bears the burden of persuasion on fairness" given "the factually intense nature of the burden-shifting inquiry" and the "modest benefit" gained from the shift.[46]

■ The failure to shift the burden is not outcome determinative under the entire fairness standard of review. We have concluded that, because the only "modest" effect of the burden shift is to make the plaintiff prove unfairness under a preponderance of the evidence standard, the benefits of clarity in terms of trial presentation outweigh the costs of continuing to decide either during or after trial whether the burden has shifted. Accordingly, we hold prospectively that, if the record does not permit a pretrial determination that the defendants are entitled to a burden shift, the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction.

The Defendants argue that if the Court of Chancery rarely determines the issue of burden shifting on the basis of a pretrial record, corporations will be dissuaded from forming special committees of independent directors and from seeking approval of an interested transaction by an informed vote of a majority of the minority shareholders. That argument underestimates the importance of either or both actions to the process component—fair dealing—of the entire fairness standard. This Court has repeatedly held that any board process is materially enhanced when the decision is attributable to independent directors.[47] Accordingly, judicial review for entire fairness of how the transaction

43. *Emerald Partners v. Berlin*, 787 A.2d 85, 99 (Del.2001).

44. *See, e.g., In re Cysive, Inc. S'holders Litig.*, 836 A.2d at 548 ("Because these devices are thought, however, to be useful and to incline transactions towards fairness, the *Lynch* doctrine encourages them by giving defendants the benefits of a burden shift if either one of the devices is employed.").

45. *See* William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. L. 1287, 1297 (2001) (explaining that standards of review should be functional, in that they should serve as a "useful tool that aids the court in deciding the fiduciary duty issue" rather than merely "signal the result or outcome").

46. *See In re Cysive, Inc. S'holders Litig.*, 836 A.2d at 549 (noting that it is inefficient for defendants to seek a pretrial ruling on the burden-shift unless the discovery process has generated a sufficient factual record to make such a determination).

47. *See, e.g., Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985); *Weinberger v. UOP, Inc.*, 457 A.2d at 709 n. 7.

was structured, negotiated, disclosed to the directors, and approved by the directors will be significantly influenced by the work product of a properly functioning special committee of independent directors.[48] Similarly, the issue of how stockholder approval was obtained will be significantly influenced by the affirmative vote of a majority of the minority stockholders.[49]

A fair process usually results in a fair price. Therefore, the proponents of an interested transaction will continue to be incentivized to put a fair dealing process in place that promotes judicial confidence in the entire fairness of the transaction price. Accordingly, we have no doubt that the effective use of a properly functioning special committee of independent directors and the informed conditional approval of a majority of minority stockholders will continue to be integral parts of the best practices that are used to establish a fair dealing process.

## UNFAIR DEALING PRODUCES UNFAIR PRICE

Although the entire fairness standard has two components, the entire fairness analysis is "not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." [50] In a non-fraudulent transaction, "price may be the preponderant consideration outweighing other features of the merger." [51] Evidence of fair dealing has significant probative value to demonstrate the fairness of the price obtained.

The paramount consideration, however, is whether the price was a fair one.[52]

The Court of Chancery found that the process by which the Merger was negotiated and approved was not fair and did not result in the payment of a fair price. Because the issues relating to fair dealing and fair price were so intertwined, the Court of Chancery did not separate its analysis, but rather treated them together in an integrated examination. That approach is consistent with the inherent non-bifurcated nature of the entire fairness standard of review.[53]

The independence of the members of the Special Committee was not challenged by the Plaintiff. The Court of Chancery found that the Special Committee members were competent, well-qualified individuals with business experience. The Court of Chancery also found that the Special Committee was "given the resources to hire outside advisors, and it hired not only respected, top tier of the market financial and legal counsel, but also a mining consultant and Mexican counsel." Nevertheless, the Court of Chancery found that, although the Special Committee members had their "hands ... on the oars[,]" the boat went "if anywhere, backward[.]"

The Special Committee began its work with a narrow mandate, to "evaluate a transaction suggested by the majority stockholder." The Court of Chancery found that "the Special Committee members' understanding of their mandate ... evidenced their lack of certainty about whether the Special Committee could do more than just evaluate the Merger." The

48. *Weinberger v. UOP, Inc.*, 457 A.2d at 709 n. 7.

49. *Id.* at 712, 714.

50. *Id.* at 711.

51. *Id.*

52. *See, e.g., Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 746 (Del.Ch.2007).

53. *Weinberger v. UOP, Inc.*, 457 A.2d at 711.

Court of Chancery concluded that, although the Special Committee went beyond its limited mandate and engaged in negotiations, "its approach to negotiations was stilted and influenced by its uncertainty about whether it was actually empowered to negotiate."

Accordingly, the Court of Chancery determined that "from inception, the Special Committee fell victim to a controlled mindset and allowed Grupo Mexico to dictate the terms and structure of the Merger." The Special Committee did not ask for an expansion of its mandate to look at alternatives. Instead, the Court of Chancery found that the Special Committee "accepted that only one type of transaction was on the table, a purchase of Minera by Southern Peru."

In its post-trial opinion, the Court of Chancery stated that this "acceptance" influenced the ultimate determination of unfairness, because "it took off the table other options that would have generated a real market check and also deprived the Special Committee of negotiating leverage to extract better terms." The Court of Chancery summarized these dynamics as follows:

In sum, although the Special Committee members were competent businessmen and may have had the best of intentions, they allowed themselves to be hemmed in by the controlling stockholder's demands. Throughout the negotiation process, the Special Committee's and Goldman's focus was on finding a way to get the terms of the Merger structure proposed by Grupo Mexico to make sense, rather than aggressively testing the assumption that the Merger was a good idea in the first place.

Goldman made its first presentation to the Special Committee on June 11, 2004. Goldman's conclusions were summarized in an "Illustrative Give/Get Analysis." The Court of Chancery found this analysis "made patent the stark disparity between Grupo Mexico's asking price and Goldman's valuation of Minera: Southern Peru would 'give' stock with a market price of $3.1 billion to Grupo Mexico and would 'get' in return an asset worth no more than $1.7 billion."

According to the Court of Chancery, the Special Committee's controlled mindset was illustrated by what happened after Goldman's initial analysis could not value the "get"—Minera—anywhere near Grupo Mexico's asking price, the "give":

From a negotiating perspective, that should have signaled that a strong response to Grupo Mexico was necessary and incited some effort to broaden, not narrow, the lens. Instead, Goldman and the Special Committee went to strenuous lengths to equalize the values of Southern Peru and Minera. The onus should have been on Grupo Mexico to prove Minera was worth $3.1 billion, but instead of pushing back on Grupo Mexico's analysis, the Special Committee and Goldman devalued Southern Peru and topped up the value of Minera. The actions of the Special Committee and Goldman undermine the defendants' argument that the process leading up to the Merger was fair and lend credence to the plaintiff's contention that the process leading up to the Merger was an exercise in rationalization.

The Court of Chancery found that, following Goldman's first presentation, the Special Committee abandoned a focus on whether Southern Peru would get $3.1 billion in value in an exchange. Instead, the Special Committee moved to a "relative valuation" methodology that involved comparing the values of Southern Peru and Minera. On June 23, 2004, Goldman advised the Special Committee that Southern Peru's DCF value was $2.06 billion and,

thus, approximately $1.1 billion below Southern Peru's actual NYSE market price at that time.

The Court of Chancery was troubled by the fact that the Special Committee did not use this valuation gap to question the relative valuation methodology. Instead, the Special Committee was "comforted" by the analysis, which allowed them to conclude that DCF value of Southern Peru's stock (the "give") was not really worth its market value of $3.1 billion. The Court of Chancery found that:

A reasonable special committee would not have taken the results of those analyses by Goldman and blithely moved on to relative valuation, without any continuing and relentless focus on the actual give-get involved in real cash terms. But, this Special Committee was in the altered state of a controlled mindset. Instead of pushing Grupo Mexico into the range suggested by Goldman's analysis of Minera's fundamental value, the Special Committee went backwards to accommodate Grupo Mexico's asking price—an asking price *that never really changed.*

The Court of Chancery concluded "[a] reasonable third-party buyer free from a controlled mindset would not have ignored a fundamental economic fact that is not in dispute here—in 2004, Southern Peru stock could have been sold for [the] price at which it was trading on the New York Stock Exchange."

In this appeal, the Defendants contend that the Court of Chancery did not understand Goldman's analysis and rejected their relative valuation of Minera without an evidentiary basis. According to the Defendants, a relative valuation analysis is the appropriate way to perform an accurate comparison of the value of Southern Peru, a publicly-traded company, and Minera, a private company. In fact, the Defendants continue to argue that relative valuation is the only way to perform an "apples-to-apples" comparison of Southern Peru and Minera.

Moreover, the Defendants assert that Goldman and the Special Committee did actually believe that Southern Peru's market price accurately reflected the company's value. According to the Defendants, however, there were certain assumptions reflected in Southern Peru's market price that were not reflected in its DCF value, *i.e.*, the market's view of future copper price increases. Therefore, the Defendants submit that:

If the DCF analysis was missing some element of value for [Southern Peru], it would also miss that very same element of value for Minera. In short, at the time that Goldman was evaluating Minera, its analysis of [Southern Peru] demonstrated that mining companies were trading at a premium to their DCF values. The relative valuation method allowed Goldman to account for this information in its analysis and value Minera fairly.

Accordingly, the Defendants argue that the Court of Chancery failed to recognize that the difference between Southern Peru's DCF and market values also implied a difference between Minera's DCF value and its market value.

The Defendants take umbrage at the Court of Chancery's statement that "the relative valuation technique is not alchemy that turns a sub-optimal deal into a fair one." The Court of Chancery's critical comments regarding a relative value methodology were simply a continuation of its criticism about how the Special Committee operated. The record indicates that the Special Committee's controlled mindset was reflected in its assignments to Goldman. According to the Court of Chancery, "Goldman appears to have helped its client

rationalize the one strategic option available within the controlled mindset that pervaded the Special Committee's process."

The Defendants continue to argue that the Court of Chancery would have understood that "relative valuation" was the "appropriate way" to compare the values of Southern Peru and Minera if a Goldman witness (Del Favero) had testified at trial. As noted earlier, that argument is inconsistent with the Defendants' post-trial assertion that the record was replete with evidence of what Goldman did (a relative valuation analysis) and why that was done. That argument also disregards the trial testimony of the Defendants' expert witness, Professor Schwartz, who used the same relative valuation methodology as Goldman.

Prior to trial, the Defendants represented that Professor Schwartz would be called at trial to "explain that the most reliable way to compare the value of [Southern Peru] and Minera for purposes of the Merger was to conduct a relative valuation." In their pretrial proffer, the Defendants also represented that Professor Schwartz's testimony would demonstrate that "based on relative valuations of Minera and [Southern Peru] using a reasonable range of copper prices ... the results uniformly show that the Merger was fair to [Southern Peru] and its stockholders."

At trial, Professor Schwartz attributed the difference between Southern Peru's DCF value and its market value to the fact that the market was valuing Southern Peru's stock "at an implied copper price of $1.30." Professor Schwartz testified, "if I use $1.30, it gives me the market price of [Southern Peru] and it gives me a market price of Minera Mexico which still makes the transaction fair." In other words, it was fair to "give" Grupo Mexico $3.75 billion of Southern Peru stock because Min-

era's DCF value, using an assumed long-term copper price of $1.30, implied a "get" of more than $3.7 billion.

The Court of Chancery found that Professor Schwartz's conclusion that the market was assuming a long-term copper price of $1.30 in valuing Southern Peru was based entirely on post-hoc speculation, because there was no credible evidence in the record that anyone at the time of the Merger contemplated a $1.30 long-term copper price. In fact, Southern Peru's own public filings referenced $0.90 per pound as the appropriate long-term copper price. The Court of Chancery summarized its findings as follows:

> Thus, Schwartz's conclusion that the market was assuming a long-term copper price of $1.30 in valuing Southern Peru appears to be based entirely on post-hoc speculation. Put simply, there is no credible evidence of the Special Committee, in the heat of battle, believing that the long-term copper price was actually $1.30 per pound but using $0.90 instead to give Southern Peru an advantage in the negotiation process.

The Court of Chancery also noted that Professor Schwartz did not produce a standalone equity value for Minera that justified issuing shares of Southern Peru stock worth $3.1 billion at the time the Merger Agreement was signed.

The record reflects that the Court of Chancery did understand the Defendants' argument and that its rejection of the Defendants' "relative valuation" of Minera was the result of an orderly and logical deductive reasoning process that is supported by the record. The Court of Chancery acknowledged that relative valuation is a valid valuation methodology. It also recognized, however, that since "relative valuation" is a comparison of the DCF values of Minera and Southern Peru, the result is only as reliable as the input data

used for each company. The record reflects that the Court of Chancery carefully explained its factual findings that the data inputs Goldman and Professor Schwartz used for Southern Peru in the Defendants' relative valuation model for Minera were unreliable.

The Court of Chancery weighed the evidence presented at trial and set forth in detail why it was not persuaded that "the Special Committee relied on truly equal inputs for its analyses of the two companies." The Court of Chancery found that "Goldman and the Special Committee went to strenuous lengths to equalize the value of Southern Peru and Minera." In particular, the Court of Chancery found that "when performing the relative valuation analysis, the cash flows for Minera were optimized to make Minera an attractive acquisition target, but no such dressing up was done for Southern Peru."

The Court of Chancery also noted that Goldman never advised the Special Committee that Minera was worth $3.1 billion, or that Minera could be acquired at, or would trade at, a premium to its DCF value if it were a public company. Nevertheless, the Court of Chancery found "the Special Committee did not respond to its intuition that Southern Peru was overvalued in a way consistent with its fiduciary duties or the way that a third-party buyer would have." Accordingly, the Court of Chancery concluded:

> The Special Committee's cramped perspective resulted in a strange deal dynamic, in which a majority stockholder kept its eye on the ball—actual value benchmarked to cash—and a Special Committee lost sight of market reality in an attempt to rationalize doing a deal of the kind the majority stockholder proposed. After this game of controlled mindset twister and the contortions it involved, the Special Committee agreed to give away over $3 billion worth of actual cash value in exchange for something worth demonstrably less, and to do so on terms that by consummation made the value gap even worse, without using any of its contractual leverage to stop the deal or renegotiate its terms. Because the deal was unfair, the defendants breached their fiduciary duty of loyalty.

Entire fairness is a standard by which the Court of Chancery must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness.[54] The record reflects that the Court of Chancery applied a "disciplined balancing test," taking into account all relevant factors.[55] The Court of Chancery considered the issues of fair dealing and fair price in a comprehensive and complete manner. The Court of Chancery found the process by which the Merger was negotiated and approved constituted unfair dealing and that resulted in the payment of an unfair price.

The Court of Chancery's post-trial determination of entire fairness must be accorded substantial deference on appeal.[56] The Court of Chancery's factual findings are supported by the record and its conclusions are the product of an orderly and

---

**54.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1179 (Del.1995); *Nixon v. Blackwell,* 626 A.2d 1366, 1373, 1378 (Del.1993); *accord Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d at 1120.

**55.** *See Nixon v. Blackwell,* 626 A.2d at 1373.

**56.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d at 1180; *Rosenblatt v. Getty Oil Co.,* 493 A.2d at 937.

logical deductive reasoning process.[57] Accordingly, the Court of Chancery's judgment, that the Merger consideration was *not* entirely fair, is affirmed.[58]

## DAMAGE AWARD PROPER

■ In the Court of Chancery, the Plaintiff sought an equitable remedy that cancelled or required the Defendants to return to Southern Peru the shares that Southern Peru issued in excess of Minera's fair value. In the alternative, the Plaintiff asked for rescissory damages in the amount of the then present market value of the excess number of shares that Grupo Mexico held as a result of Southern Peru paying an unfair price in the Merger.

In the Court of Chancery and on appeal, the Defendants argue that no damages are due because the Merger consideration was more than fair. In support of that argument, the Defendants rely on the fact that Southern Peru stockholders should be grateful, because the market value of Southern Peru's stock continued on a generally upward trajectory in the years after the Merger. Alternatively, the Defendants argue that any damage award should be at most a fraction of the amount sought by the Plaintiff, and, in particular, that the Plaintiff has waived the right to seek rescissory damages because of "his lethargic approach to litigating the case."

The Court of Chancery rejected the Defendants' argument that the post-Merger performance of Southern Peru's stock eliminates the need for damages. It noted that the Defendants did not "present a reliable event study about the market's reaction to the Merger, and there is evidence that the market did not view the Merger as fair in spite of material gaps in disclosure about the fairness of the Merger." The trial judge was of the opinion that a "transaction like the Merger can be unfair, in the sense that it is below what a real arms-length deal would have been priced at, while not tanking a strong company with sound fundamentals in a rising market, such as the one in which Southern Peru was a participant. That remains my firm sense here...." The Court of Chancery's decision to award some amount of damages is supported by the record and the product of a logical deductive reasoning process.

Nevertheless, the Court of Chancery did agree with the Defendants' argument that the Plaintiff's delay in litigating the case rendered it inequitable to use a rescission-based approach in awarding damages.[59] The Court of Chancery reached that determination because "[r]escissory damages are the economic equivalent of rescission and[,] therefore[,] if rescission itself is unwarranted because of the plaintiff's delay, so are rescissory damages."[60] Instead of entering a rescission-based remedy, the Court of Chancery decided to craft a damage award, as explained below:

> [The award] approximates the difference between the price that the Special Committee would have approved had the Merger been entirely fair (i.e., absent a breach of fiduciary duties) and the price that the Special Committee actually agreed to pay. In other words, I will take the difference between this fair price and the market value of 67.2 mil-

57. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d at 1180.

58. *Id.*

59. *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 699 (Del.Ch.1996).

60. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 855 A.2d 1059, 1072 (Del.Ch. 2003).

lion shares of Southern Peru stock as of the Merger date. That difference, divided by the average closing price of Southern Peru stock in the 20 trading days preceding the issuance of this opinion, will determine the number of shares that the defendants must return to Southern Peru. Furthermore, because of the plaintiff's delay, I will only grant simple interest on that amount, calculated at the statutory rate since the date of the Merger.[61]

After determining the nature of the damage award, the Court of Chancery determined the appropriate valuation for the price that the Special Committee *should* have paid. To calculate a fair price for remedy purposes, the Court of Chancery balanced three separate values. The first value was a standalone DCF value of Minera. Using defendant-friendly modifications to the Plaintiff's expert's DCF valuation, the Court of Chancery calculated that a standalone equity value for Minera as of October 21, 2004 was $2.452 billion. The second value was the market value of the Special Committee's 52 million share counteroffer made in July 2004, "which was sized based on months of due diligence by Goldman about Minera's standalone value, calculated as of the date on which the Special Committee approved the Merger." Because Grupo Mexico wanted a dollar value of stock, the Court of Chancery fixed the value at what 52 million Southern Peru shares were worth as of October 21, 2004, the date on which the Special Committee approved the Merger, at $2.388 billion, giving Minera credit for the price growth to that date. The third value was the equity value of Minera derived from a comparable companies analysis using the companies identified by Goldman. Using

the median premium for merger transactions in 2004, calculated by Mergerstat to be 23.4%, and applying that premium to the value derived from the Court of Chancery's comparable companies analysis yielded a value of $2.45 billion.

The Court of Chancery gave those three separate values equal weight in its damages equation: (($2.452 billion + $2.388 billion + $2.45 billion)/3). The result was a value of $2.43 billion. It then made an adjustment to reflect the fact that Southern Peru bought 99.15%, not 100%, of Minera, which yielded a value of $2.409 billion. The value of 67.2 million Southern Peru shares as of the Merger Date was $3.756 billion.[62] Therefore, the base damage award by the Court of Chancery amounted to $1.347 billion.[63] The Court of Chancery then added interest from the Merger Date, at the statutory rate, without compounding and with that interest to run until time of the judgment and until payment.

The Court of Chancery stated that Grupo Mexico could satisfy the judgment by agreeing to return to Southern Peru such number of its shares as are necessary to satisfy this remedy. The Court of Chancery also ruled that any attorneys' fees would be paid out of the award.

The Defendants' first objection to the Court of Chancery's calculation of damages is that its methodology included the Special Committee's counteroffer of July 2004 as a measure of the true value of Minera. The Defendants assert that the counteroffer was "based only on Goldman's preliminary analyses of the companies before the completion of due diligence. And there was no evidence this was anything

---

**61.** (citations omitted).

**62.** $55.89 closing price × 67,200,000 = $3,755,808,000.

**63.** $3.756 billion-$2.409 billion = $1.347 billion.

other than what it appears to be—a negotiating position."

The Court of Chancery explained its reason for including the counteroffer in its determination of damages, as follows:

> In fact, you know, the formula I used, one of the things that I did to be conservative was actually to use a bargaining position of the special committee. And I used it not because I thought it was an aggressive bargaining position of the special committee, but to give the special committee and its advisors some credit for thinking. It was one of the few indications in the record of something that they thought was actually a responsible value.
>
> And so it was actually not put in there in any way to inflate. It was actually to give some credit to the special committee. If I had thought that it was an absurd ask, I would have never used it. I didn't think it was any, really, aggressive bargaining move. I didn't actually see any aggressive bargaining moves by the special committee. I saw some innovative valuation moves, but I didn't see any aggressive bargaining moves.

The record reflects that the value of Minera pursuant to the counteroffer ($2.388 billion) was very close to the other two values used by the Court of Chancery ($2.452 billion and $2.45 billion). The Court of Chancery properly exercised its discretion—for the reasons it stated—by including the Special Committee's counteroffer as one of the component parts in its calculation of damages. Therefore, the Defendants' argument to the contrary is without merit.

The Defendants also argue that the Court of Chancery "essentially became its own expert witness regarding damages by basing its valuation, at least in part, on its own computer models." In support of that argument, the Defendants rely upon the following statement by the trial judge during oral argument on the fee award: "I'm not going to disclose everything that we got on our computer system, but I can tell you that there are very credible remedial approaches in this case that would have resulted in a much higher award." The Defendants submit that "[i]n the absence of proof from [the] Plaintiff, this speculation and outside-the-record financial modeling is impermissible."

In making a decision on damages, or any other matter, the trial court must set forth its reasons. This provides the parties with a record basis to challenge the decision. It also enables a reviewing court to properly discharge its appellate function.

In this case, the Court of Chancery explained the reasons for its calculation of damages with meticulous detail. That complete transparency of its actual deliberative process provided the Defendants with a comprehensive record to use in challenging the Court of Chancery's damage award on appeal and for this Court to review. Accordingly, any remedial approaches that the Court of Chancery may have considered and rejected are irrelevant.

 The Court of Chancery has the historic power "to grant such … relief as the facts of a particular case may dictate." [64] Both parties agree that an award of damages by the Court of Chancery after trial in an entire fairness proceeding is reviewed on appeal for abuse of discre-

---

**64.** *Weinberger v. UOP, Inc.,* 457 A.2d at 714; see also *Glanding v. Industrial Trust Co.,* 45 A.2d 553, 555 (Del.1945) ("[T]he Court of Chancery of the State of Delaware inherited its equity jurisdiction from the English Courts."); 1 Victor B. Woolley, *Woolley on Delaware Practice* § 56 (1906).

tion.[65] It is also undisputed that the Court of Chancery has greater discretion when making an award of damages in an action for breach of duty of loyalty than it would when assessing fair value in an appraisal action.[66]

In this case, the Court of Chancery awarded damages based on the difference in value between what was paid (the "give") and the value of what was received (the "get"). In addition to an actual award of monetary relief, the Court of Chancery had the authority to grant pre- and post-judgment interest, and to determine the form of that interest.[67] The record reflects that the Court of Chancery properly exercised its broad historic discretionary powers in fashioning a remedy and making its award of damages. Therefore, the Court of Chancery's judgment awarding damages is affirmed.

## ATTORNEYS' FEE AWARD

■ The Plaintiff petitioned for attorneys' fees and expenses representing 22.5% of the recovery plus post-judgment interest. The Court of Chancery awarded 15% of the $2.031 billion judgment, or $304,742,604.45, plus post-judgment interest until the attorneys' fee and expense award is satisfied ("Fee Award"). The Court of Chancery found that the Fee Award "fairly implements the most important factors our Supreme Court has highlighted under *Sugarland*,[68] including the importance of benefits," and "creates a healthy incentive for plaintiff's lawyers to actually seek real achievement for the companies that they represent in derivative actions and the classes that they represent in class actions."

On appeal, the Defendants contend "the Court of Chancery abuse[d] its discretion by granting an unreasonable fee award of over $304 million that pays the Plaintiff's counsel over $35,000 per hour worked and 66 times the value of their time and expenses." Specifically, they argue the Court of Chancery gave the first *Sugarland* factor, *i.e.* the benefit achieved, "dispositive weight," and that the remaining factors do not support the Fee Award. The Defendants also argue that the Court of Chancery erred by failing to assess the reasonableness of the Fee Award. They submit that the Court of Chancery did not: correctly apply a declining percentage analysis given the size of the judgment; consider whether the resulting hourly rate was reasonable under the circumstances; and evaluate whether the Fee Award conformed to the Delaware Rules of Professional Conduct.[69] The Defendants further contend that the Court of Chancery committed reversible error by "[a]llowing Plaintiff's attorneys to collect fees premised upon the nearly $700 million in prejudgment interest . . . even in spite of the fact that the delay impeded a full presentation of the evidence."

### Common Fund Doctrine

■ Under the common fund doctrine, "a litigant or a lawyer who recovers a

**65.** *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del.2000).

**66.** *Id.* at 441.

**67.** *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.1988).

**68.** *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del.1980).

**69.** This argument is without merit. Rule 1.5(c) of the Rules of Professional Conduct expressly contemplates fees that are based on a percentage. Comment [3] to the Rule provides that the determination of whether a particular contingent fee is reasonable is to be based on the relevant factors and applicable law. In this case, the Court of Chancery made that reasonableness determination based on the relevant factors and applicable law set forth in *Sugarland* by this Court.

common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[70] The common fund doctrine is a well-established basis for awarding attorneys' fees in the Court of Chancery.[71] It is founded on the equitable principle that those who have profited from litigation should share its costs.[72]

■ "Typically, successful derivative or class action suits which result in the recovery of money or property wrongfully diverted from the corporation ... are viewed as fund creating actions."[73] In this case, the record supports the Court of Chancery's finding that Defendants breached their duty of loyalty by exchanging over $3 billion worth of actual cash value for something that was worth much less. The record also supports the Court of Chancery's determination that the $2.031 billion judgment resulted in the creation of a common fund. Accordingly, Plaintiff's counsel, whose efforts resulted in the creation of that common fund, are entitled to receive a reasonable fee and

reimbursement for expenses from that fund.[74]

### Calculating Common Fund Attorneys' Fees

■ In the United States, there are two methods of calculating fee awards in common fund cases: the percentage of the fund method and the lodestar method.[75] Under a percentage of the fund method, courts calculate fees based on a reasonable percentage of the common fund.[76] The lodestar method multiplies hours reasonably expended against a reasonable hourly rate to produce a "lodestar," which can then be adjusted through application of a "multiplier," to account for additional factors such as the contingent nature of the case and the quality of an attorney's work.[77]

Beginning in 1881, fees were calculated and awarded from a common fund based on a percentage of that fund.[78] Fees continued to be calculated on a percentage approach for almost 100 years. During the 1970s, however, courts began to use the lodestar method to calculate fee awards in common fund cases.[79]

---

**70.** *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (citations omitted). *See also Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1049 (Del. 1996) ("[T]he condition precedent to invoking the common fund doctrine is a demonstration that a common benefit has been conferred.").

**71.** *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1044 (citations omitted).

**72.** *Id.* (citing *Boeing Co. v. Van Gemert*, 444 U.S. at 478, 100 S.Ct. 745; *Maurer v. Int'l Re-Insurance Corp.*, 95 A.2d 827, 830 (Del.1953)).

**73.** *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164–65 (Del.1989) (citing *CM & M Group, Inc. v. Carroll*, 453 A.2d 788, 795 (Del.1982)).

**74.** *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1045 (citing *Weinberger v. UOP, Inc.*, 517 A.2d 653, 654–55 (Del.Ch.1986); *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del.1966)).

**75.** *See Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1046–47; Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 at 187 (2004).

**76.** *See Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1046.

**77.** *Id.* (citations omitted).

**78.** *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124–25, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 532–33, 26 L.Ed. 1157 (1881). *See also Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1046–47 (discussing history of common fund fee awards).

**79.** *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1046–47 (citing *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167–68 (3d Cir. 1973)).

In the 1980s, two events led to the reconsideration of the lodestar method. First, in 1984, the United States Supreme Court suggested that an award in a common fund case should be based upon a percentage of the fund.[80] By that time, "the point that 'under the common fund doctrine ... a reasonable fee is based on a percentage of the fund bestowed on the class' was so well settled that no more than a footnote was needed to make it."[81] Second, in 1985, a Third Circuit Task Force issued a report concluding that all attorney fee awards in common fund cases should be structured as a percentage of the fund.[82] The report criticized the use of the lodestar method for determining the reasonableness of attorneys' fees in common fund class actions and listed nine deficiencies in the lodestar method.[83] "Ultimately, the Third Circuit allowed district court judges to exercise discretion in employing the percentage of the fund method, the lodestar method, or some combination of both, but the concerns voiced in the 1985 report, as well as in other publications, were not fully answered."[84] Today, after several years of experimentation with the lodestar method, "the vast majority of courts of appeals now permit or direct courts to use the percentage method in common-fund cases."[85]

### Delaware's Sugarland *Standard*

██ In *Sugarland Industries, Inc. v. Thomas,* this Court rejected any mechanical approach to determining common fund fee awards.[86] In particular, we explicitly disapproved the Third Circuit's "lodestar method."[87] Therefore, Delaware courts are not required to award fees based on hourly rates that may not be commensurate with the value of the common fund created by the attorneys' efforts. Similarly, in *Sugarland,* we did not adopt an inflexible percentage of the fund approach.

Instead, we held that the Court of Chancery should consider and weigh the following factors in making an equitable award of attorney fees: 1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved.[88] Delaware courts have assigned the greatest weight to the benefit achieved in litigation.[89]

---

**80.** *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

**81.** *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 962–63 (E.D.Tex.2000) (internal quotation marks omitted).

**82.** Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 255 (1985).

**83.** *Id.* at 246–50.

**84.** *Seinfeld v. Coker,* 847 A.2d 330, 335 (Del. Ch.2000) (citing *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d 768, 821 (3d Cir.1995)).

**85.** Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 at 187 (2004); Charles W. "Rocky" Rhodes, *Attorneys' Fees in Common–Fund Class Ac-*

tions: A View from the Federal Circuits, 35 The Advocate (Tex.) 56, 57–58 (2006).

**86.** *Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 149–50.

**87.** *Id.* at 150

**88.** *Id.* at 149. *See also Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.,* 977 A.2d 867, 870 (Del.2009).

**89.** See, e.g., *Julian v. E. States Const. Serv., Inc.,* 2009 WL 154432, at *2 (Del.Ch. Jan. 14, 2009) ("In determining the size of an award, courts assign the greatest weight to the benefit achieved in the litigation.") (citing *Franklin Balance Sheet Inv. Fund v. Crowley,* 2007 WL 2495018, at *8 (Del.Ch. Aug. 30, 2007)); *Seinfeld v. Coker,* 847 A.2d 330, 336 (Del.Ch.2000) ("*Sugarland's* first factor is indeed its most

## Sugarland *Factors Applied*

█ The determination of any attorney fee award is a matter within the sound judicial discretion of the Court of Chancery.[90] In this case, the Court of Chancery considered and applied each of the *Sugarland* factors. In rendering its decision on the Fee Award, the Court of Chancery began with the following overview:

> When the efforts of a plaintiff on behalf of a corporation result in the creation of a common fund, the Court should award reasonable attorneys' fees and expenses incurred by the plaintiff in achieving the benefit. Typically a-percentage-of-the-benefit approach is used if the benefit achieved is quantifiable.... And determining the percentage of the fund to award is a matter within the Court's discretion.
>
> The aptly-named *Sugarland* factor[s], perhaps never more aptly-named than today, tell us to look at the benefit achieved, the difficulty and complexity of the litigation, the effort expended, the risk-taking, [and] the standing and ability of counsel. But the most important factor, the cases suggest, is the benefit. In this case it's enormous—a common fund of over 1.3 billion plus interest.

The Court of Chancery then addressed each of the *Sugarland* factors. The result was its decision to award the Plaintiff's counsel attorneys' fees and expenses equal to 15% of the amount of the common fund.

### *Benefit Achieved*

With regard to the first and most important of the *Sugarland* factors, the benefit achieved, the Court of Chancery found that "[t]he plaintiffs here indisputably prosecuted this action through trial and secured an immense economic benefit for Southern Peru." The Court of Chancery stated that "this isn't small and this isn't monitoring. This isn't a case where it's rounding, where the plaintiffs share credit."[91] The Court of Chancery concluded that "anything that was achieved ... by this litigation [was] by these plaintiffs." With pre-judgment interest, the benefit achieved through the litigation amounts to more than $2 billion. Post-judgment interest accrues at more than $212,000 per day. The extraordinary benefit that was achieved in this case merits a very substantial award of attorneys' fees.

█ The Defendants take issue with the fact that the Fee Award was based upon the total damage award, which included pre-judgment interest. They contend that including such interest in the damage award is reversible error because the Plaintiff took too long to litigate this matter. The record reflects that the Court of Chancery considered the slow pace of the litigation in making the Fee Award. In response to the Defendants'

---

important-the results accomplished for the benefit of the shareholders.") (citations omitted); *Dickerson v. Castle*, 1992 WL 205796, at *1 (Del.Ch. Aug. 21, 1992) ("Typically, the benefit achieved by the action is accorded the greatest weight.") (citations omitted), *aff'd* 1993 WL 66586 (Del. Mar. 2, 1993); *In re Anderson Clayton S'holders Litig.*, 1988 WL 97480, at *3 (Del.Ch. Sept. 19, 1988) ("This Court has traditionally placed greatest weight upon the benefits achieved by the litigation."); *In re Maxxam Group, Inc.*, 1987 WL 10016, at *11 (Del.Ch. Apr. 16, 1987) ("The benefits achieved by the litigation constitute the factor generally accorded the greatest weight.").

**90.** *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del.1998).

**91.** *Cf. In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d at 609–12 (awarding a "substantially smaller [attorney] fee" than that requested by plaintiffs for settlement of claims challenging a fully negotiable merger proposal where no appreciable risk was taken and credit was "shared" with special committee).

arguments, the trial judge stated: "I'm not going to ... exclude interest altogether. I get that argument.... The interest I awarded is fairly earned by the plaintiffs. It's a lower amount. And, again, I've taken that [pace of litigation] into account by the percentage that I'm awarding." The Court of Chancery's decision to include pre-judgment interest in its determination of the benefit achieved was not arbitrary or capricious, but rather was the product of a logical and deductive reasoning process.

### Difficulty and Complexity

■ The Court of Chancery carefully considered the difficulty and complexity of the case. It noted that the Plaintiff's attorneys had succeeded in presenting complex valuation issues in a persuasive way before a skeptical court:

> They advanced a theory of the case that a judge of this court, me, was reluctant to embrace. I denied their motion for summary judgment. I think I gave [Plaintiff's counsel] a good amount of grief that day about the theory. I asked a lot of questions at trial because I was still skeptical of the theory. It faced some of the best lawyers I know and am privileged to have come before me, and they won....
>
> I think when you talk about *Sugarland* and you talk about the difficulty of the litigation, was this difficult? Yes, it was. Were the defense counsel formidable and among the best that we have in our bar? They were. Did the plaintiffs have to do a lot of good work to get done and have to push back against a judge who was resistant to their approach? They did.

The Plaintiff's attorneys established at trial that Southern Peru had agreed to overpay its controlling shareholder by more than fifty percent ($3.7 billion com-pared to $2.4 billion). In doing so, the Court of Chancery found that the Plaintiff had to "deal with very complex financial and valuation issues" while being "up against major league, first-rate legal talent." This factor supports a substantial award of attorneys' fees.

### Contingent Representation

The Plaintiff's attorneys pursued this case on a contingent fee basis. They invested a significant number of hours and incurred more than one million dollars in expenses. The Defendants litigated vigorously and forced the Plaintiff to go to trial to obtain any monetary recovery. Accordingly, in undertaking this representation, the Plaintiff's counsel incurred all of the classic contingent fee risks, including the ultimate risk—no recovery whatsoever. The Court of Chancery acknowledged that the fee award was "going to be a lot per hour to people who get paid by the hour," but that in this case, the Plaintiff's attorneys' compensation was never based on an hourly rate. Therefore, the Court of Chancery found that an award representing 15% of the common fund was reasonable in light of the absolute risk taken by Plaintiff's counsel in prosecuting the case through trial on a fully contingent fee basis.

### Standing and Ability of Counsel

The Court of Chancery acknowledged that it was familiar with Plaintiff's counsel and had respect for their skills and record of success. The Defendants do not contest the skill, ability or reputation of the Plaintiff's counsel. They argue, however, that the Court of Chancery "should have weighed more heavily Plaintiff's counsel's undoubted ability against the causal manner in which this case was litigated." The record does not support that argument.

First, the Court of Chancery credited the Defendants' arguments that a rescission-based remedy was inappropriate because of the Plaintiff's delay in litigating the case. Second, the Court of Chancery noted that the record could justify a much larger award of attorneys' fees, but it ultimately applied a "conservative metric because of Plaintiff's delay." Accordingly, the record reflects that the Court of Chancery's Fee Award took into account the length of time involved in getting this case to trial.

### Time and Effort of Counsel

The effort by the Plaintiff's attorneys was significant. The Plaintiff's attorneys reviewed approximately 282,046 pages in document production and traveled outside the United States to take multiple depositions. They also engaged in vigorously contested pretrial motion practice. They invested their firms' resources by incurring over a million dollars of out-of-pocket expenses. Most significantly, however, the Plaintiff's attorneys took this case to trial and prevailed. We repeat the Court of Chancery's statement: "anything that was achieved ... by this litigation [was] by [the Plaintiff's attorneys]."

The primary focus of the Defendants' challenge to the Court of Chancery's Fee Award is on the hourly rate that it implies, given that Plaintiff's counsel spent 8,597 hours on this case. They argue that the Court of Chancery abused its discretion by failing to consider the hourly rate implied by the Fee Award as a "backstop check" on the reasonableness of the fee. The Court of Chancery recognized the implications of this argument: "I get it. It's

approximately—on what I awarded, approximately $35,000 an hour, if you look at it that way." However, the Court of Chancery did not look at it that way.

*Sugarland* does not require, as the Defendants argue, courts to use the hourly rate implied by a percentage fee award, rather than the benefit conferred, as the benchmark for determining a reasonable fee award. To the contrary, in *Sugarland,* this Court refused to adopt the Third Circuit's lodestar approach, which primarily focuses on the time spent.[92] There, we summarized that methodology, as follows:

> Under *Lindy I*, the Court's analysis must begin with a calculation of the number of hours to be credited to the attorney seeking compensation. The total hours multiplied by the approved hourly rate is the "lodestar" in the Third Circuit's formulation. It has, indeed, been said that the time approach is virtually the sole consideration in making a fee ruling under *Lindy I*.[93]

In rejecting the lodestar methodology, we held the Court of Chancery judges "should not be obliged to make the kind of elaborate analyses called for by the several opinions in *Lindy I* and *Lindy II*." [94]

Moreover, in *Sugarland,* this Court rejected an argument that was almost identical to the one the Defendants make in this case. There, the corporation asserted on appeal that in assessing the reasonableness of the fee the Court of Chancery should have given more weight to the plaintiffs' counsel's hours and hourly rate.[95] This Court expressly rejected the use of time expended as the principal basis for determining fees awarded to plaintiff's counsel.[96] Instead, we held that the

92. *Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 150.

93. *Id.*

94. *Id.*

95. *Id.* at 149–50.

96. *Id.* at 150.

*benefit achieved* by the litigation is the "common yardstick by which a plaintiff's counsel is compensated in a successful derivative action." [97]

In applying that "common yardstick," we affirmed the Court of Chancery's determination that the plaintiffs' attorneys were "entitled to a *fair percentage of the benefit* inuring to Sugarland and its stockholders...." [98] We also affirmed the Court of Chancery's determination that 20% of the benefit achieved was a reasonable award. [99] Our only disagreement with the Court of Chancery in *Sugarland* was the "benefit" to which the percentage of 20% should be applied. [100]

In this case, the Court of Chancery properly realized that "[m]ore important than hours is 'effort, as in what Plaintiffs' counsel actually did.'" [101] In applying *Sugarland*, the Court of Chancery understood that it had to look at the hours and effort expended, but recognized the general principle from *Sugarland* that the hours that counsel worked is of secondary importance to the benefit achieved. [102] In this case, the Court of Chancery was aware of the hourly rate that its Fee Award implied and nonetheless properly concluded that, in accordance with *Sugarland*, the Plaintiff's attorneys were entitled to a *fair percentage* of the benefit, *i.e.,* common fund. It then found that "an award of 15 percent of the revised judgment, inclusive of expenses ... is appropriate."

The Defendants' alternative to their hourly argument is a challenge to the fairness of the percentage awarded by the Court of Chancery. The Defendants contend that the Court of Chancery erred by failing to apply a declining percentage analysis in its fee determination. According to the Defendants, this Court's decision in *Goodrich v. E.F. Hutton Group, Inc.*[103] supports the *per se* use of a declining percentage. We disagree.

■ In *Goodrich*, we discussed the declining percentage of the fund concept, noting that the Court of Chancery rightly "acknowledged the merit of the emerging judicial consensus that the percentage of recovery awarded should 'decrease as the size of the [common] fund increases.'" [104] We also emphasized, however, that the multiple factor *Sugarland* approach to determining attorneys' fee awards remained adequate for purposes of applying the equitable common fund doctrine. [105] Therefore, the use of a declining percentage, in applying the *Sugarland* factors in common fund cases, is a matter of discretion and is not required *per se*.

In this case, the record does not support the Defendants' argument that the Court of Chancery failed to apply a "declining percentage." In exercising its discretion and explaining the basis for the Fee Award, the Court of Chancery reduced the award from the 22.5% requested by the

97. *Id.* at 147. *See* Irving Morris and Kevin Gross, *Attorneys' Fee Applications In Common Fund Cases Under Delaware Law: Benefit Achieved as "The Common Yardstick."* 324 PLI/Lit 167 (1987).

98. *Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 150 (emphasis added).

99. *Id.* at 151.

100. *Id.* at 150–51.

101. *In re Del Monte Foods Co. S'holders Litig.,* 2011 WL 2535256, at *13 (Del.Ch. June 27, 2011) (citation omitted).

102. *Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 147.

103. *Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039 (Del.1996).

104. *Id.* at 1048 (citations omitted).

105. *Id.* at 1050.

Plaintiff to 15% based, at least in part, on its consideration of the Defendants' argument that the percentage should be smaller in light of the size of the judgment:

> Now, I gave a percentage of only 15 percent rather than 20 percent, 22 1/2 percent, or even 33 percent because the amount that's requested is large. I did take that into account. *Maybe I am embracing what is a declining thing.* I've tried to take into account all the factors, the delay, what was at stake, and what was reasonable. And I gave defendants credit for their arguments by going down to 15 percent. The only basis for some further reduction is, again, envy or there's just some level of too much, there's some natural existing limit on what lawyers as a class should get when they do a deal.[106]

Thus, the record reflects that the Court of Chancery did reduce the percentage it awarded due to the large amount of the judgment. The Defendants are really arguing that the Fee Award percentage did not "decline" enough.

*Fee Award Percentage Discretionary*

In determining the amount of a reasonable fee award, our holding in *Sugarland* assigns the greatest weight to the benefit achieved in the litigation.[107] When the benefit is quantifiable, as in this case, by the creation of a common fund, *Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit. The *Sugarland* factor that is given the greatest emphasis is the size of the fund created, because a "common fund is itself the measure of success ... [and] represents the benchmark from which a reasonable fee will be awarded." [108]

■ Delaware case law supports a wide range of reasonable percentages for attorneys' fees, but 33% is "the very top of the range of percentages." [109] The Court of Chancery has a history of awarding lower percentages of the benefit where cases have settled before trial.[110] When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred.[111] When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including

---

106. Emphasis added.

107. *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d at 149–50.

108. 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6, at 547, 550 (4th ed.2001). *See* Irving Morris & Kevin Gross, *Attorneys' Fee Applications In Common–Fund Cases Under Delaware Law: Benefit Achieved as "The Common Yardstick,"* 324 PLI/Lit 167, 175 (1987).

109. *In re Emerson Radio S'holder Deriv. Litig.,* 2011 WL 1135006, at *3 (Del.Ch. Mar. 28, 2011) (citing *Thorpe v. CERBCO*, 1997 WL 67833 at *6 (Del.Ch. Feb. 6, 1997)).

110. *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *13 (Del.Ch. Aug. 30, 2007).

111. *In re Emerson Radio S'holder Deriv. Litig.,* 2011 WL 1135006, at *3 n. 2 (citing *Julian v.*

*E. States Constr. Serv., Inc.,* 2009 WL 154432 (Del.Ch. Jan. 14, 2009) (awarding total of 8% when little time and effort were invested before settlement); *Korn v. New Castle Cty.,* 2007 WL 2981939 (Del.Ch. Oct. 3, 2007) (awarding 10% when "there was limited discovery, no briefing, and no oral argument...."); *Seinfeld v. Coker*, 847 A.2d 330 (Del.Ch.2000) (awarding 10% when case settled after limited document discovery and no motion practice); *In re The Coleman Co. S'holders Litig.,* 750 A.2d 1202 (Del.Ch.1999) (awarding 10% where counsel did not take a single deposition or file or defend a pretrial motion); *In re Josephson Int'l, Inc.,* 1988 WL 112909 (Del.Ch. Oct. 19, 1988) (awarding 18% when case settled after ten days of document discovery); *Schreiber v. Hadson Petroleum Corp.,* 1986 WL 12169 (Del.Ch. Oct. 29, 1986) (awarding 16% when case settled "[s]hortly after suit was filed")).

multiple depositions and some level of motion practice, fee awards in the Court of Chancery range from 15–25% of the monetary benefits conferred.[112] "A study of recent Delaware fee awards finds that the average amount of fees awarded when derivative and class actions settle for both monetary and therapeutic consideration is approximately 23% of the monetary benefit conferred; the median is 25%."[113] Higher percentages are warranted when cases progress to a post-trial adjudication.[114]

The reasonableness of the percentage awarded by the Court of Chancery is reviewed for an abuse of discretion.[115] The question presented in this case is how to properly determine a reasonable percentage for a fee award in a megafund case. A

recent study by the economic consulting firm National Economic Research Associates ("NERA") demonstrates that overall as the settlement values increase, the amount of fee percentages and expenses decrease.[116] The study reports that median attorneys' fees awarded from settlements in securities class actions are generally in the range of 22% to 30% of the recovery until the recovery approaches approximately $500 million.[117] Once in the vicinity of over $500 million, the median attorneys' fees falls to 11%.[118]

Appellate courts that have examined a "megafund rule" requiring a fee percentage to be capped at a low figure when the recovery is quite high, have rejected it as a blanket rule. It is now accepted that "[a] mechanical, a *per se* application of the

**112.** *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *3 & n. 3 (citing *In re Cablevision/Rainbow Media Gp. Tracking Stock Litig.*, 2009 WL 1514925 (Del.Ch. May 22, 2009) (awarding 22.5% where plaintiffs' counsel devoted nearly 5,000 hours to the case); *Gelobter v. Bressler*, 1991 WL 236226 (Del.Ch. Nov. 6, 1991) (awarding 16.67% where counsel pursued extensive discovery, including seventeen depositions); *Stepak v. Ross*, 1985 WL 21137 (Del.Ch. Sept. 5, 1985) (awarding 20% where plaintiff took extensive discovery)).

**113.** *See* Richard A. Rosen, David C. McBride & Danielle Gibbs, *Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement*, § 27.10, at 27–100 (2010).

**114.** *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *3 & n. 4 (citing *Berger v. Pubco Corp.*, 2010 WL 2573881 (Del.Ch. June 23, 2010) (awarding a total fee of 31.5% where "lengthy and thorough litigation by counsel . . . resulted in a final judgment and not a quick settlement"); *Gatz v. Ponsoldt*, 2009 WL 1743760 (Del.Ch. June 12, 2009) (awarding 33% in case litigated extensively, including through an appeal in the Delaware Supreme Court); *Ryan v. Gifford*, 2009 WL 18143 (Del.Ch. Jan. 2, 2009) (awarding 33% of cash amount where plaintiffs' counsel engaged in "meaningful discovery," survived

"significant, hard fought motion practice" and incurred nearly $400,000 in expenses); *Tuckman v. Aerosonic Corp.*, 1983 WL 20291 (Del.Ch. Apr. 21, 1983) (awarding 29% where litigated through trial and two appeals)).

**115.** *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d at 149.

**116.** *See* Dr. Renzo Comolli et al., *Recent Trends in Securities Class Action Litigation: 2012 Mid–Year Review*, NERA Econ. Consulting, July 2012, at p. 31. For an example, the study finds fee awards in securities class actions amount to 27% in cases where the settlement is between $25 million and $100 million, 22.4% in cases where the settlement is between $100 million and $500 million, and 11.1 % in cases where the settlement is above $500 million. *Id.* Figure 31. *See also* Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION § 14.121 at 187 (2004) ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund.").

**117.** Dr. Renzo Comolli et al., *Recent Trends in Securities Class Action Litigation: 2012 Mid–Year Review*, NERA Econ. Consulting, July 2012, at p. 31.

**118.** *Id.*

'megafund rule' is not necessarily reasonable under the circumstances of a case." [119] For example, although the Third Circuit recognized that its jurisprudence confirms the use of a sliding scale as "appropriate" for percentage fee awards in large recovery cases, it has held that trial judges are not required to use a declining percentage approach in every case involving a large settlement.[120] The Third Circuit reasoned that it has "generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees," and that "the declining percentage concept does not trump the fact-intensive [In re] Prudential [Ins. Co. Am. Sales Litigation, 148 F.3d 283 (3d Cir.1998) ]/Gunter [v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir.2000) ] [factors,]" [121] which are similar to this Court's Sugarland factors.

Although several courts have recognized the declining percentage principle, none have imposed it as a per se rule.[122] In Goodrich, we held the Court of Chancery did not abuse its discretion by rejecting a "per se rule that awarded attorney's fees as a percentage in relation to the maximum common fund available, without regard to the benefits actually realized by class members." [123] We reasoned that "[t]he adoption of a mandatory methodology or particular mathematical model for determining attorney's fees in common fund cases would be the antithesis of the equitable principles from which the concept of such awards originated." [124] That ratio decidendi equally applies in this case.

Therefore, we decline to impose either a cap or the mandatory use of any particular range of percentages for determining attorneys' fees in megafund cases. As we stated in Goodrich, "[n]ew mechanical guidelines are neither appropriate nor needed for the Court of Chancery." [125] We reaffirm that our holding in Sugarland sets forth the proper factors for determining attorneys' fee awards in all common fund cases.[126]

### Fee Award Reasonable Percentage

■ The percentage awarded as attorneys' fees from a common fund is committed to the sound discretion of the Court of Chancery.[127] In determining the amount of a fee award, the Court of Chancery must consider the unique circumstances of each case. Its reasons for the selection of a given percentage must be stated with particularity.

The Court of Chancery quantified the Fee Award as 15% of the common fund.[128]

---

119. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F.Supp.2d 732, 753–54 (S.D.Tex. 2008) (citing cases and concluding that "[a] mechanical, a *per se* application of the 'megafund rule' is not necessarily reasonable under the circumstances of a case.").

120. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302–03 (3d Cir.2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund.").

121. *Id.* at 303.

122. *Id.* at 302–03 (3d Cir.2005).

123. *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d at 1049.

124. *Id.* at 1050.

125. *Id.*

126. *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del.1980).

127. *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del.1966).

128. *See Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F.Supp.2d 942 (E.D.Tex.2000) (awarding 15% fee on a common fund of $1 billion); *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y.1998) (awarding 14% fee on common fund of $1 billion).

The Court of Chancery addressed the *Sugarland* factors and how those factors caused it to arrive at that percentage, as follows:

> The plaintiffs here indisputably *prosecuted this action through trial* and secured an *immense economic benefit* for Southern Peru. I've already said—and I'm going to take into account—I already encouraged the plaintiffs to be conservative in their application because they weren't as rapid in moving this as I would have liked. I don't think, though, that you can sort of ignore them, to say because they didn't invest six years on this case on an *entirely contingent basis*, deal with very *complex financial and valuation issues*, and ignore the fact that they were *up against major league, first-rate legal talent.*
>
> . . . .
>
> "[O]ne of the things ... the defendants got credit for in this case is that the plaintiffs were slow.... I also took that into account in how I approach interest in the case.... [I] also ... have to take that into account in the *percentage I award* for the plaintiffs[,] ... [a]nd I took that into account. *I took some cap factors into account,* setting the interest in what I did.... I have to take some away from the plaintiff's ... lawyers on that ... frankly, there were *grounds for me to award more* to the company. And I didn't. And—and so that is going to impel me to *reduce the percentage* that I'm awarding.... [129]

We repeat the Court of Chancery's conclusion:

> Now, I gave a percentage of only 15 percent rather than 20 percent, 22 1/2

percent, or even 33 percent because the amount that's requested is large. I did take that into account. Maybe I am embracing what is a declining thing. I've tried to take into account all the factors, the delay, what was at stake, and what was reasonable. And I gave defendants credit for their arguments by going down to 15 percent. The only basis for some further reduction is, again, envy or there's just some level of too much, there's some natural existing limit on what lawyers as a class should get when they do a deal.

We review an award of attorneys' fees for an abuse of discretion.[130] When an act of judicial discretion is under appellate review, this Court may not substitute its notions of what is right for those of the trial judge, if his or her judgment was the product of reason and conscience, as opposed to being either arbitrary or capricious.[131] As we recently stated, the challenge of quantifying fee awards is entrusted to the trial judge and will not be disturbed on appeal in the absence of capriciousness or factual findings that are clearly wrong.[132]

In this case, the Court of Chancery carefully weighed and considered all of the *Sugarland* factors. The record supports its factual findings and its well-reasoned decision that a reasonable attorneys' fee is 15% of the benefit created. Accordingly, we hold that the Fee Award was a proper exercise of the Court of Chancery's broad discretion in applying the *Sugarland* factors under the circumstances of this case.

### Conclusion

The judgment of the Court of Chancery, awarding more than $2 billion in damages

---

129. Emphasis added.

130. *Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 149.

131. *Chavin v. Cope,* 243 A.2d 694, 695 (Del. 1968).

132. *EMAK Worldwide, Inc. v. Kurz,* 50 A.3d 429, 432–33, 2012 WL 1319771, at *3 (Del. Ch. Apr. 17, 2012).

and more than $304 million in attorneys' fees, is affirmed.

BERGER, Justice, concurring and dissenting:

I concur in the majority's decision on the merits, but I would find that the trial court did not properly apply the law when it awarded attorneys' fees, and respectfully dissent on that issue.

The majority finds no abuse of discretion in the trial court's decision to award more than $304 million in attorneys' fees. The majority says that the trial court applied the settled standards set forth in *Sugarland Industries, Inc. v. Thomas*,[133] and that this Court may not substitute its notions of what is right for those of the trial court. But the trial court did not apply *Sugarland*, it applied its own world views on incentives, bankers' compensation, and envy.

To be sure, the trial court recited the *Sugarland* standards. Its analysis, however, focused on the perceived need to incentivize plaintiffs' lawyers to take cases to trial. The trial court hypothesized that a stockholder plaintiff would be happy with a lawyer who says, "If you get really rich because of me, I want to get rich, too."[134] Then, the trial court talked about how others get big payouts without comment, but that lawyers are not viewed the same way:

> [T]here's an idea that when a lawyer or law firms are going to get a big payment, that there's something somehow wrong about that, just because it's a lawyer. I'm sorry, but investment banks have hit it big.... They've hit it

big many times. And to me, envy is not an appropriate motivation to take into account when you set an attorney fee.[135]

The trial court opined that a declining percentage for "mega" cases would not create a healthy incentive system, and that the trial court would not embrace such an approach. Rather, the trial court repeatedly pointed out that "plenty of market participants make big fees when their clients win," and that if this were a hedge fund manager or an investment bank, the fee would be okay.[136] In sum, the trial court said that the fundamental test for reasonableness is whether the fee is setting a good incentive, and that the only basis for reducing the fee would be envy.[137] That is not a decision based on *Sugarland*.

### Reargument Unanimously Denied

The appellants, Americas Mining Corporation ("AMC") and nominal defendant, Southern Copper Corporation, have filed a motion for reargument. The issue raised on reargument is the narrow question of whether the relevant "benefit achieved" for calculating attorneys' fees in a derivative case, against a majority stockholder and other defendants, is properly defined as the entire judgment paid to the corporation, or, in this case, 19% of the entire judgment paid to the corporation, because the majority stockholder defendant owns 81% of the corporation that will receive the judgment.

This Court has carefully considered the motion for reargument filed by the Defendants, and the response filed by the Plaintiff. We have determined that the motion for reargument is procedurally barred un-

133. *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del.1980).

134. Appellant Southern Copper Corporation's Opening Brief, Exhibit A at 74.

135. *Id.* at 82.

136. *Id.* at 81–83.

137. *Id.* at 83–84.

der Delaware law, because the issue raised on reargument was not fully and fairly presented in the Defendants' opening briefs;[138] and alternatively, because it is substantively without merit, as a matter of Delaware law.[139]

### Waiver Constitutes Procedural Bar

■■■ This Court's rules specifically require an appellant to set forth the issues raised on appeal and to fairly present an argument in support of those issues in their opening brief. If an appellant fails to comply with these requirements on a particular issue, the appellant has abandoned that issue on appeal.[140] Supreme Court Rule 14(b)(vi)(A)(3) states that "[t]he merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."

■■■ Neither of the Defendants' opening briefs properly raised the issue set forth in the limited motion for reargument. AMC's opening brief did not mention the issue at all and Southern Copper Corporation's opening brief only mentioned the issue indirectly in a footnote. Arguments in footnotes do not constitute raising an issue in the "body" of the opening brief.[141]

Therefore, the issue raised in the limited motion for reargument is procedurally barred, as a matter of Delaware law, because it has been waived. On that basis alone the motion must be denied.[142]

### Argument Without Substantive Merit

■■■ Alternatively, and as an independent basis for denying the limited motion for reargument, we conclude that the Court of Chancery properly rejected the "look through" approach to awarding attorneys' fees in a derivative action. The derivative suit has been characterized as "one of the most interesting and ingenious of accountability mechanisms for large formal organizations."[143] It enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation.[144]

■■■ Because a derivative suit is being brought on behalf of the corporation, any recovery must go to the corporation.[145] In addition, a stockholder who is directly injured retains the right to bring an individual action for those injuries affecting his or her legal rights as a stockholder.[146] Such an individual injury is distinct from an injury to the corporation alone. "In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation."[147]

138. *Flamer v. State*, 953 A.2d 130, 134 (Del. 2008); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 (Del.2004).

139. *Wilderman v. Wilderman*, 328 A.2d 456, 458 (Del.Ch.1974). *See Gentile v. Rossette*, 906 A.2d 91, 102–03 (Del.2006); *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004).

140. *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d at 1242.

141. *See* Supreme Court Rule 14(d) ("Footnotes shall not be used for argument ordinarily included in the body of a brief. . . .").

142. *Michigan v. Long*, 463 U.S. 1032, 1044, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

143. *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del.1988) (quoting R. Clark, *Corporate Law* 639–40 (1986)).

144. *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d at 351.

145. *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d at 1036.

146. *Id.*

147. *Id.*

In *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, this Court held that whether a claim is derivative or direct depends solely upon two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[148] It is undisputed that this is a derivative proceeding. In this case, the corporation was harmed and the total recovery is awarded to the corporation, Southern Copper Corporation—not "nominally" but actually.

 In assessing the "benefit achieved," the Court of Chancery held, and this Court affirmed, that the benefit achieved in a derivative action is the benefit to the corporation. The "look through" approach to awarding attorneys' fees in a derivative case was properly rejected by the Court of Chancery long ago in *Wilderman v. Wilderman*.[149] Similarly, in rejecting the Defendants' "look-through" argument in this derivative action, the Court of Chancery stated:

> There's also this argument that I should only award—I should basically look at it like it's a class action case and that the benefit is only to the minority stockholders. I don't believe that's our law. And this is a corporate right. And, you

know, if you look going back to 1974 ... there was Wilderman versus Wilderman, 328 A.2d 456, which talks about not disregarding the corporate form in a derivative action and looking at the benefit to the corporation, to the more recent Carlton—Carlson case, which is now reported, in 925 A.2d 506 does the same.

 No stockholder, including the majority stockholder, has a claim to any particular assets of the corporation.[150] Accordingly, Delaware law does not analyze the "benefit achieved" for the corporation in a derivative action, against a majority stockholder and others, as if it were a class action recovery for minority stockholders only. Therefore, the limited motion for reargument is substantively without merit. On that alternative basis alone the motion must also be denied.[151]

Now, therefore, this 21st day of September 2012, it is hereby ordered that the motion for reargument is unanimously denied.

---

**148.** *Id.* at 1033.

**149.** *Wilderman v. Wilderman,* 328 A.2d at 458.

**150.** *Norte & Co. v. Manor Healthcare Corp.,* 1985 WL 44684, at *3 (Del.Ch.) ("[T]he corporation is the legal owner of its property and the stockholders do not have any specific interest in the assets of the corporation.").

**151.** *Michigan v. Long,* 463 U.S. at 1044, 103 S.Ct. 3469.